**LOCAL UNION 219, RETAIL CLERKS INTERNATIONAL ASSOCIATION, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 14481.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 15, 1958.

Decided March 19, 1959.

Mr. S. G. Lippman, Washington, D. C., for petitioner. Mr. Joseph E. Finley, Washington, D. C., also entered an appearance for petitioner.

Mr. Owsley Vose, Attorney, National Labor Relations Board, with whom Messrs. Jerome D. Fenton, General Counsel, National Labor Relations Board, Thomas J. McDermott, Associate General Counsel, National Labor Relations Board, and Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, were on the brief, for respondent.

Before WILBUR K. MILLER, WASHINGTON and BURGER, Circuit Judges.

WASHINGTON, Circuit Judge.

This case concerns the interpretation to be given the "cooling-off" provisions of Section 8(d) of the National Labor Relations Act, added by 61 Stat. 142 (1947), 29 U.S.C.A. § 158(d), with particular reference to the requirement of notice to the Federal Mediation and Conciliation Service and its state and territorial counterparts. The Board held that an economic strike called by the petitioner union was unlawful—and in violation of Section 8(d) (4) and Section 8 (b) (3) of the Act—because notice of the underlying dispute was not given to the appropriate Federal and state agencies within 30 days after service of the prescribed 60-day notice to the employers. It entered a cease and desist order against the union. 120 N.L.R.B. No. 48 (1958). The union petitions this court to review and set aside the order; the Board petitions for enforcement.

The collective bargaining agreement here involved was by its terms to expire on March 15, 1957. Some ten weeks prior to that date—on January 2, 1957—the union notified the employer-parties that it desired to amend or modify the contract. It acted pursuant to Section 8(d) (1) of the Act, which lays down the "60-day notice" requirement. Bargaining began on February 7, 1957. On March 19, 1957, the union for the first time mailed a notice of dispute, pursuant to Section 8(d) (3) of the Act, to the Federal Mediation and Conciliation Service (the "Mediation Service") and the Illinois Department of Labor. On March 29, 1957, the union commenced an economic strike, with picketing, against certain of the employers; on April 6, it took similar action against the remaining employers. On April 11, 1957, agreement between the union and the employ-

ers was reached and the strike and picketing ceased. The first strike began, therefore, some ten days after the mailing of notice of a dispute to the Federal and state agencies.

In appraising the union's conduct, we turn first to the language of the proviso to Section 8(d), which says:

"That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

"(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

"(3) *notifies the Federal Mediation and Conciliation Service within thirty days after such notice* of the existence of a dispute, *and simultaneously therewith notifies any State or Territorial agency* established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

"(4) continues in full force and effect, without resorting to strike

or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later * * *." (Emphasis supplied.)

Section 8(d) further provides that "any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee * * * for the purposes of sections 8, 9, and 10 of this Act * * *." Since Section 8(d) also defines good faith collective bargaining, any established violation of Section 8(d) is also a violation of either Section 8(a) (5) or Section 8(b) (3) and hence an unfair labor practice for which the Board may issue a cease and desist order under Section 10(c), 29 U.S.C.A. § 160(c).

█ The issue in the present case is whether an economic strike, more than 60 days after the giving of notice to the employer as required by Section 8(d) (1), but less than 30 days after an "untimely" (delayed) notice to the Federal and state agencies under Section 8(d) (3), is a violation of Section 8(d) (4).[1] The petitioner union admits that the notice to the Mediation Service under Section 8(d) (3) must be given within 30 days after the giving of the 60-day notice required by Section 8(d) (1); it also admits that this notice to the Mediation Service is a mandatory provision of Section 8(d); it further admits that its untimely notice to the Service (given 76 days after the giving of the 60-day notice) was a violation of Section 8(d) (3) and hence an unfair labor practice under Section 8(b) (3). But—contrary to the conclusion of the Board—the union denies that it committed a further violation of Section 8(d) (4) when it went

1. For present purposes, we use the term "economic strike" to refer to a strike relating to the subject matter of the negotiations occuring upon the termination or requested modification of a collective bargaining agreement. Section 8(d) of the Act applies only to economic strikes, and not strikes which are designed to protest unfair labor practices of employ-

ers, even during the "60-day" period specified in Section 8(d) (4). Mastro Plastics Corp. v. National Labor Relations Board, 1956, 350 U.S. 270, 284, 286, 76 S.Ct. 349, 100 L.Ed. 309. Accordingly, nothing in the present opinion should be considered to have any bearing on such unfair-labor-practice strikes.

out on strike 86 and 94 days after the giving of the 60-day notice, but only 10 and 18 days after the notice was given to the Mediation Service.

## I.

The union urges that the "plain words" of the statute forbid the Board's interpretation. Section 8(d) (4) and the loss-of-status provision of Section 8 (d) are, it says, only concerned with a 60-day period; therefore, Section 8(d) (4) was only meant to apply to the notice required under Section 8(d) (1). The union cites the legislative history in an effort to show that a 60-day cooling-off period was all that Congress intended. See, e. g., 93 Cong.Rec. 3839 (1947). It relies heavily on the trial examiner's report in Retail Clerks International Association, Local 1179, 109 N.L.R.B. 754, 767 (1954) (The J. C. Penney Company case). The trial examiner there stated that notice to the Mediation Service is not a condition precedent to a strike under Section 8(d) (4); that nothing in the legislative history requires reading Section 8(d) (3) to the contrary; that in fact because of Sections 7 and 13 of the Act, 29 U.S.C.A. §§ 157, 163, Section 8(d) (3) cannot be read to derogate from the right to strike. Finally the trial examiner remarked that the provision for notice to the Mediation Service "appears to be an ancillary feature of the longer notice period of 60 days which measures the 'cooling off' period * * *." Id. at 768. The union concludes with the argument that "had Congress intended to outlaw a strike after an untimely 8(d) (3) notice, it could easily have used language to attain its purpose."

■ In the first place, there are no "plain words" of Section 8(d). The Supreme Court itself has recognized that the section "is susceptible of various interpretations." National Labor Relations Board v. Lion Oil Co., 1957, 352 U.S. 282, 288, 77 S.Ct. 330, 334, 1 L.Ed.2d 331. The Court observed that the Taft-Hartley Watch-Dog Committee of the 80th Congress recognized the ambiguities of the section, and that even members of the National Labor Relations

Board "have expressed divergent views on the proper construction of § 8(d) (4) * * *." Ibid. The Court therefore concluded that "in the face of this ambiguity it will not do simply to say Congress could have made itself clearer * * *." Id., 352 U.S. at page 289, 77 S.Ct. at page 334. Justice Frankfurter stated in his separate opinion in Lion Oil that—

> "It has * * * become a judicial responsibility to find that interpretation which can most fairly be said to be embedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." Id., 352 U.S. at page 297, 77 S.Ct. at page 338.

■ What then are the scheme and general purposes of the statute? In Mastro Plastics Corp. v. National Labor Relations Board, 1956, 350 U.S. 270, 284, 76 S.Ct. 349, 100 L.Ed. 309, the Court recognized a "dual" purpose in the Taft-Hartley Act: (1) to protect the right of employees to engage in concerted activities, and (2) to substitute collective bargaining for economic warfare. See also National Labor Relations Board v. Lion Oil Co., supra, 352 U.S. at page 289, 77 S.Ct. at page 334. To state the dual purpose is to present the dilemma of interpreting Section 8(d), for it is precisely here that the two objectives may come into conflict. The whole spirit of Section 8(d) seems to imply, however, that in the context of an expiration, termination, or modification of a collective-bargaining agreement, "Congress may have set a very high value on peaceful adjustments, i. e., the absence of strikes." Mastro Plastics Corp. v. National Labor Relations Board, supra, 350 U.S. at page 297, 76 S.Ct. at page 365 (Frankfurter, J., dissenting). There can be no doubt that the Mediation Service was considered by Congress as a vital part of the collective-bargaining machinery under Section 8(d) and not merely an ancillary feature, as the trial examiner in J. C. Penney Company maintained. Although it is true that under Section 203(b) of

the Labor Management Relations Act, 61 Stat. 153 (1947), 29 U.S.C.A. § 173(b), the Mediation Service is given a discretionary and not a mandatory function in proffering its services in a labor dispute, nevertheless, notice under Section 8(d) (3) is mandatory, and the whole thrust of the section is to give the Service sufficient time to intervene in an effective manner in advance of a stoppage of work, rather than after it has occurred, should the Service deem intervention necessary or desirable. See Stark, Mediation: Use of Government Agencies in Labor Contract Negotiations, Prac.Law., Jan. 1957, pp. 53, 57. As Senator Ives indicated, attention was to be given to the prevention of industrial strife as well as to a cure after the strife had begun. 93 Cong.Rec. 4590 (1947); see 93 Cong.Rec. A4699 (1947). Senator Taft himself emphasized that the 60-day notice provision was included in Section 8(d) "in order to afford time for free collective bargaining, and then for the intervention of the Mediation Service." 93 Cong.Rec. 3839 (1947). The state and territorial services were no doubt considered to have a comparable function.

## II.

Granted then that one of the purposes of the statute is to give full scope to the use of the Mediation Service and like agencies in labor disputes arising under Section 8(d), the problem remains as to which interpretation of the section will prove most harmonious with that aim.

The Board's brief in the instant case urges that Congress could not have been concerned only with the 60-day period following notice to the other party; it must have been concerned also with the 30-day period following the notice to the Mediation Service. The brief adds:

"Since the 30-day period following the giving of notice to the mediation agencies * * * falls wholly within the 60-day period of the notice of modification or termination required by Section 8(d) (1), the prohibition against strikes in this 60-day period automatically covers strikes in the 30-day period after giving timely notice to the mediation agencies under Section 8(d) (3). Hence it was unnecessary for Section 8(d) (4) to contain any specific prohibition against strikes in this latter 30-day period."

Accepting this argument, as we do, what conclusions may be drawn? If the union fails to give any notice under Section 8(d) (3), or if it gives such notice only after it goes on strike, it would seem reasonable to consider the strike a violation of Section 8(d) (4), even though the strike occurs after the 60-day cooling-off period. See the Board's decision in J. C. Penney Co., supra. It seems reasonable, also, to hold the strike to be an unfair labor practice if no notice at all had been given to the state agencies, even though it had been given to the Federal agency. Local 156, United Packinghouse Workers, 117 N.L.R.B. 670 (1957) (the DuQuoin case).

More difficult problems arise when "untimely" notice is given to the Mediation Service under Section 8(d) (3)— untimely in the sense of being given more than 30 days after the beginning of the 60-day period specified in Section 8(d) (1). In International Union of Operating Engineers, Local No. 181 v. Dahlem Construction Co., 6 Cir., 1951, 193 F.2d 470, the union went out on strike several months after it had given untimely notice under Section 8(d) (3); nevertheless, the Sixth Circuit held that the failure to send timely notice forever tainted the strike under Section 8(d) (4) as an unfair labor practice. Such an interpretation of Section 8(d) (3) seems unreasonable, and counter to the spirit of Sections 7 and 13 of the Act, which guarantee the right to strike and the right to participate in other concerted activities.

In an effort to offset the harshness of such an interpretation, a master appointed by a district court indicated that the failure to send timely notice under Section 8(d) (3) could be cured by sending a new 60-day notice under Section 8(d) (1), then sending timely notice under

Section 8(d) (3), and then going out on strike after the 60-day waiting period prescribed in Section 8(d) (4) had elapsed. See Schneid v. District 50, United Mine Workers, 33 CCH Labor Cases, ¶ 70,885, at 94,679, 94,684 (N.D. Ill.1957). Such a view seems a triumph of form over substance. Surely the original 60-day notice should still be valid. The second 60-day notice is but a useless formalism, the purpose of which is to attempt to comply with both the purpose and literal language of the section. A more rational solution seems necessary.

The General Counsel of the Board argued before the trial examiner in the present case that the spirit of Section 8(d) (3) is violated only when the Mediation Service or state agency does not have 30 days to intervene in the bargaining process. Thus, he said, a strike more than 30 days after an untimely notice would not only be valid under Section 8(d) (4), but would cure the violation of Section 8(d) (3) as well. The trial examiner, of course, never reached the solution offered by the General Counsel, since the strike in the present case " 'took place after an interval of substantially less than the minimum of 30 days which would have elapsed had the Respondent's notification been timely.' "[2] Support for the General Counsel's position, however, may perhaps be found in the Taft-Hartley Watch-Dog Committee Report, in which it was emphasized that "under section 8(d) (3), a party . . . must notify the Service 30 days before resorting to a strike or lock-out." S. Rep.No.986, 80th Cong., 2d Sess., pt. 3, at 15 (1948). Although this interpretation may be consonant with the purpose of the section, it does not seem to give

sufficient weight to the requirement of Section 8(d) (3) that notice to the Mediation Service must be given "within 30 days" of the 60-day notice under Section 8(d) (1).

■ It seems more logical to us to interpret Section 8(d) (3) as making two demands: to require the giving of notice within a 30-day period after the giving of notice under Section 8(d) (1), and to require also a 30-day waiting period before a strike or lockout, under Section 8(d) (4). Thus if untimely notice were given, the union would have committed a violation of Section 8(d) (3). If, however, the union were to wait for 30 days beyond the Section 8(d) (3) notice, and then go out on strike, it would not be in violation of Section 8(d) (4). This interpretation would be consonant with the Board holding in the present case, in which the union went out on strike 10 and 18 days after the untimely Section 8(d) (3) notice, and with the Board holding in United Mine Workers, District 50, 118 N.L.R.B. 220 (1957), in which the union went out on strike 18 days after an untimely notice under Section 8(d) (3). Such an interpretation would avoid the harsh result in Dahlem, and the dubious result in Schneid. Furthermore, even though the waiting period is now beyond a literal 60-day period, this added period hardly seems to violate Sections 7 and 13, for it is only brought about by the union's failure to give the notice prescribed by Section 8(d) (3), cf. 93 Cong.Rec. 3839 (1947), and not because of a harsh interpretation of the Act.

■ For these reasons, we think the Board was correct in holding the union guilty of an unfair labor practice, and in issuing a cease and desist order.[3] On

2. Here the trial examiner was quoting from the examiner's report in United Mine Workers, District 50, 118 N.L.R.B. 220 (1957). In that case, which was analogous to the present, the trial examiner concluded, and the Board affirmed, that "the legal consequences of a tardy notification are no better than an omitted one—in the circumstances of *this* case at least."

3. We do not reach the question of loss of status by employees who engage in a strike under circumstances such as the present. Cf. National Labor Relations Board v. Lion Oil Co., supra, 352 U.S. at page 303, 77 S.Ct. at page 341 (Frankfurter, J., concurring in part, dissenting in part); Mastro Plastics Corp. v. National Labor Relations Board, supra, 350 U.S. at page 287 and at 296, 297, 76 S.Ct. at page 360 and at 364, 365 (Frankfurter, J., dissenting).

820

that basis, the order of the Board will be affirmed, and enforced.

So ordered.

WILBUR K. MILLER, Circuit Judge, concurs in the result.