UNITED FURNITURE WORKERS OF AMERICA, AFL-CIO and Local 270, United Furniture Workers of America, AFL-CIO, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 17961.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 19, 1964.

Decided April 16, 1964.

Certiorari Denied Oct. 12, 1964.

See 85 S.Ct. 73.

Mr. Martin Raphael, New York City, of the bar of the Court of Appeals of New York, *pro hac vice,* by special leave of court, for petitioners. Messrs. David E. Feller and Michael H. Gottesman, Washington, D. C., also entered appearances for petitioners.

Mrs. Nancy M. Sherman, Atty., N. L. R. B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., National Labor Relations Board, were on the brief, for respondent.

Before EDGERTON, Senior Circuit Judge, and DANAHER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

When a collective bargaining agreement is in effect, Congress has been at some pains to prescribe the steps to be followed by the party to it who initiates action to effect a change in its terms. These steps are spelled out in Section 8(d) of the National Labor Relations Act 29 U.S.C. § 158(d); and they may be stated shortly in this wise: The party who seeks to terminate or modify a contract must (1) give written notice of such purpose to the other parties to the contract 60 days in advance, (2) offer to meet and confer about a new or altered contract, (3) notify the federal and state mediation and conciliation services within 30 days after the notice referred to in (1), and (4) continue, without resort to strike or lock-out, as the case may be, to observe the terms of the existing contract throughout the notice period.

■ Upon this petition by a union to review and modify an order of the National Labor Relations Board, we are confronted with the question of the consequences flowing from the union's total failure to take Step No. 3, *i. e.*, to notify the mediation services. The Board held that this failure rendered a strike by the union unlawful, and that the striking employees thereby became vulnerable to lawful discharge by the employer. In so holding, the Board did, in our view, reflect accurately the Congressional purposes; and we affirm its order.

I

The employer in this case is Fort Smith Chair Company, an Arkansas furniture manufacturer. For more than 20 years it had had bargaining relations with Local 270 of the United Furniture Workers of America, AFL–CIO.[1] The latest contract between them had a termination date of June 1, 1961. On March 27, 1961, the Union notified the Company by letter of its desire to allow the current contract to expire by its terms and to negotiate a new contract to take its place. Negotiating meetings between the parties were held on May 29 and 31, immediately prior to the June 1 expiration date. The Union orally proposed at those meetings a number of improvements in the employment terms, including a general wage increase. The Company made several counter-proposals, including a revision of the contractual provisions for the determination of incentive pay. The Company agreed to certain proposed modifications in the arrangements for holiday pay; and the Union apparently agreed to one suggestion made by the Company, although there is some conflict in the evidence as to just what this latter agreement was.

No other areas of agreement were found, however. As the hour of expiration of the existing contract approached, there were the usual last-minute efforts to reach agreement. The Union indicated that it would extend the contract, as modified by the matters newly agreed upon, for one year. The Company jet-

---

1. The local and the international unions are both petitioners before us, and are jointly referred to hereinafter as the Union.

tisoned most of its proposed changes, but continued to ask for changes in the provisions governing the use of incentive pay rates. The leadership of the Union submitted the Company's latest position to the membership with a recommendation that it be rejected. The membership so voted, and the strike got under way on June 1.

Five days later a federal mediator, in the course of a conversation with the Company's attorney about an unrelated matter, remarked that he had received no notice under Section 8(d) of the Act, and, indeed, had had no prior knowledge that the existing contract had been the subject of new negotiations. It having been established that neither the Federal Mediation and Conciliation Service nor the Arkansas Department of Labor had received any notification under Section 8(d) (3), the Company, on June 8, advised the Union by telegram that, because of the unlawful nature of the strike, the Company declined to continue negotiations [2] and was acting to terminate the employment of all workers participating in the strike. This latter was done by letters to individual employees. The plant was thereafter operated with new employees and under somewhat different employment terms until December 15, 1961, when the Union ended the strike and asked for reinstatement of the discharged workers. Reinstatement was not granted to any of the striking employees, although some were re-employed as new workers.

In the complaint issued against the Company, the principal violations charged were of, one, Sections 8(a) (3) and (1), in that the striking workers had been discharged and not reinstated; and, two, Sections 8(a) (5) and (1), in that the Company had refused to bargain with the Union after the discharge of its members. The Trial Examiner found such violations to have occurred, but the Board disagreed with his conclusions in this regard and ordered dismissal of the complaint.[3] It is that order which is before us for review, and, for the reasons hereinafter stated, we leave it undisturbed.

## II

This court has had occasion heretofore to appraise the significance attached by Congress to the giving of the notices required by Section 8(d) (3). After an extensive review of the legislative background of the requirement, we concluded that "one of the purposes of the statute is to give full scope to the use of the Mediation Service and like agencies in labor disputes arising under Section 8(d)." Local Union 219, Retail Clerks International Association AFL–CIO v. N. L. R. B., 105 U.S.App.D.C. 232, 236, 265 F.2d 814, 818 (1959). Since, in the court's view, "the whole thrust of the section is to give the Service sufficient time to intervene in an effective manner in advance of a stoppage of work, rather than after it has occurred," the court went on to hold a union in violation of the Act where the strike occurred

---

2. A negotiating session had been held on June 7, the day after the federal mediator first heard of the dispute. The federal mediator attended the June 7 meeting, but the Company made plain, with the Union's acquiescence, that its participation in that meeting was with a full reservation of whatever rights accrued to it by reason of the Union's failure to give the Section 8(d) (3) notices.

3. It seems clear to us that four members of the Board held the discharges did not violate the Act for the reasons discussed later in this opinion. In addition, two members held, alternatively, that the

"loss-of-status" provision of § 8(d) applied to a strike taking place after the 60-day period but before notice to the mediation services. See Local Union 219, Retail Clerks International Association, AFL-CIO v. N. L. R. B., 105 U.S.App. D.C. 232, 265 F.2d 814 (1959). Compare Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Mfg. Co., 312 F.2d 181 (2d Cir. 1962), cert. denied, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963). One member of the Board dissented. Because of our disposition of this case, we find it unnecessary to pass upon the "loss-of-status" issue.

less than 30 days after the giving of the § 8(d) (3) notices, such notices themselves having been given after the 60-day period contemplated in § 8(d) (1). In the course of reaching this result, the court observed that "[i]f the union fails to give any notice under Section 8(d) (3) * * * it would seem reasonable to consider the strike a violation of Section 8(d) (4), even though the strike occurs after the 60-day cooling-off period."

The facts so hypothesized are, of course, the case now before us. The earlier assumption as to the legal significance of such facts seems to us sound and of continuing validity. Its application here means, at the least, that the strike was unlawful from its inception, and that, accordingly, it was a concerted activity unprotected by Section 7 of the Act, and, therefore, the discharge of those employees participating in it was not unlawful.

■ The Union endeavors in two ways to escape this consequence of its failure to comply with Section 8(d). The first argument premises that Section 8(d) is concerned only with strikes in support of contractual changes or modifications proposed by the strikers; and it is asserted that, since the Union here ultimately offered to extend the contract for a year, the ensuing strike was wholly defensive in character as being directed against the Company's failure to abandon all of its counter-proposals. In point of fact, however, the Board found that the extension offer related to the contract not in its original form but as embodying the concessions made by the Company in the course of the negotiations looking towards a new contract. And, in any event, the Board read Section 8(d), correctly we think, as expressly putting the responsibility for giving the required notices, under § 8(d) (3) as well as under § 8(d) (1), upon the party to the contract who raises the possibility of industrial conflict by moving to open up the existing contractual arrangements. Once the contract is thrown out on the table for re-bargaining at the instance of one party, counter-proposals are normally forthcoming; and the course of bargaining frequently tends to become a dim and tangled thicket in which it is easier to sense the lurking threat of industrial strife than to see from what quarter it comes. Because this is the likely course of events once an initiative is taken to change a contract, and because Congress believed that it was imperative in the public interest for disinterested and expert third parties to have an opportunity to bring the parties together, the burden of giving the notices was, not unreasonably, placed on the party who voluntarily elects to put these events in train.[4]

The Union is contending in effect that the burden shifts in accordance with the twistings and turnings of the bargaining negotiations. Such a construction seems to us, however, to be fraught in the highest degree with the peril that the public interest in the emollient intervention of the mediation services will fall between the two stools of contending parties wholly intent upon the uncertain—and frequently fluctuating—fortunes of their negotiating positions. It is a peril which can be avoided by assigning a fixed and definite responsibility for notifying the public agencies. Congress has made that assignment and, not surprisingly, it is to the party who starts the process.

It is, of course, both natural and normal for either party to a collective bargaining agreement to move to achieve changes in it. Congress has provided ample scope for this to be done, subject only to some simple procedural requirements designed to minimize the likelihood

---

4. This record speaks in especially insistent terms of the desirability of expert mediation. The parties, perhaps because of their long history of bargaining relations, were slow in coming to grips with their problems in the face of the expiration date deadline, and, once engaged, there seems to have been a considerable amount of misunderstanding and confusion about the precise significance of some of the issues. Expert outside help might well have saved the day.

of strike or lock-out. It was the Union here who opened the door to these eventualities. It was the Union, then, who had to give the Section 8(d) (3) notices. The Union may or may not be thought to have been more reasonable and complaisant than the Company as the negotiations unfolded, but this is not a yardstick which either has been, or could usefully be, employed to allocate responsibility for notifying the mediation services.

 The second way which the Union seeks to find around its omission to give the notices is its contention that the record shows that the Company's true reason for discharging the employees was not the strike but to get the Union out of its life. The Trial Examiner did not so find, and the Board, after reviewing explicitly the evidence claimed as demonstrative of this contention, concluded that "employee participation in the unlawful strike was the real reason for the discharge." We think that this determination has adequate support in the record, and it, therefore, becomes final from our standpoint. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In common with two members of the Board, we see no need to pursue the question of the relevance of the Company's motivation, assuming it to have been other than as found.

██ The strike being unlawful, the participants in it became subject to a lawful power of discharge in the employer; and the exercise of that power could not result in a violation by the employer of Sections 8(a) (3) and (1). The discharge in this case having resulted in loss by the Union of its majority representation, the failure by the Company to treat with it after such discharge is not a violation of Sections 8 (a) (5) and (1).[5] The Board's action in dismissing the complaint is

Affirmed.

5. See United Electrical Radio and Machine Workers of America (UE), Local 1113 v. N. L. R. B., 96 U.S.App.D.C. 46, 223

F.2d 338 (1955), cert. denied, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956).