**NABORS TRAILERS, INC. (n/k/a Steego Transportation Equipment Centers, Inc.), Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

No. 89–4670.

United States Court of Appeals, Fifth Circuit.

Aug. 31, 1990.

Barry A. Hartstein, Ty D. Laurie, Chicago, Ill., Keith M. Pyburn, Jr., Christopher P. Charlton, New Orleans, La., for petitioner, cross-respondent.

David Seid, Aileen Armstrong, Howard E. Perlstein, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., for respondent, cross-petitioner.

James R. Waers, Dana K. Apple, Blake & Uhlig, Kansas City, Kan., for amicus curiae, Intern. Broth. of Boilermakers, etc.

H. Frank Malone, Dir., New Orleans, La., for other interested parties.

Before REAVLEY, DUHÉ and WIENER, Circuit Judges.

REAVLEY, Circuit Judge:

The National Labor Relations Board (the "Board") determined that Nabors Trailers, Inc. engaged in an unfair labor practice when it reduced Union employees' wages before negotiations between company and Union representatives over a new collective bargaining contract had reached an impasse. The Board also determined that Nabors Trailers engaged in an unfair labor practice by implementing the wage reduction less than thirty days after it had informed the Federal Mediation and Conciliation Service that company and Union representatives were in the midst of negotiations over a new collective bargaining contract. Based on these findings, the Board ordered Nabors Trailers to compensate the Union employees for all losses of earnings and benefits resulting from the wage reduction. Nabors Trailers has filed a petition for review of the Board's decision and Order, seeking reversal of the finding that the company engaged in unfair labor practices or, in the alternative, seeking modification of the back-pay remedy. The Board has filed a cross-application for enforcement of its Order. We sustain the Board's findings in part but deny the Board's application for enforcement and remand for additional proceedings.

I.

For a number of years prior to February of 1988, Nabors Trailers maintained a truck trailer manufacturing facility in Mansfield, Louisiana. The production and maintenance workers at this facility were unionized,[1] and a collective bargaining contract traditionally had governed the terms and conditions of employment for these workers. In March of 1984, Nabors Trailers and the Union entered into a collective bargaining contract that was to remain in effect until March 22, 1987. The contract contained a provision pursuant to which the contract would be extended for an additional year unless either party gave a termination notice more than sixty days prior to the contract's expiration date. Following such notice, the parties were required to bargain. If the parties did not reach a new agreement by the expiration date, either party could terminate the contract after

---

1. The employees were represented jointly by the International Brotherhood of Boilermakers and the International Association of Machinists and Aerospace Workers. We will refer to the production and maintenance workers and their representatives as the "Union."

giving five days written notice.[2]

Beginning in mid-December of 1986, Lester Boykin, the Union's chief negotiator, and Harlon Blackmon, Nabors Trailers' spokesman, had several conversations in which, according to Blackmon, they discussed the impending expiration of the collective bargaining contract. Blackmon contends that during each of these conversations, Boykin indicated that he was going to send Blackmon a letter. Although Blackmon did not specifically ask whether Boykin was going to send a letter giving notice to terminate the collective bargaining contract and thereby open the contract for renegotiation, the record suggests that all parties understood that to be Boykin's representation.

On January 13, however, Boykin met with the Union employees. He informed the workers that Nabors Trailers was in serious financial distress and recommended that the Union not open the collective bargaining contract for renegotiation. Boykin stated that Blackmon was expecting him to write a letter opening the contract, though Boykin had never expressly stated that he would write to that effect. Boykin then indicated that he intended to send a letter to Blackmon informing him of the Union's decision not to open the contract. The letter would be mailed so that it would arrive on the last day the contract could be opened. If all went according to plan, any attempt by the company to open the contract would be untimely, and the contract would renew itself automatically. Based on this presentation, the Union voted unanimously not to open the contract. Boykin did not inform Blackmon of the Union employees' vote.

On January 19, Boykin phoned Blackmon to cancel a previously scheduled meeting. Blackmon contends that during this conversation, Boykin verbally committed to open the contract for renegotiation. Following their conversation, Blackmon sent a letter to Boykin, stating:

In response to my telephone conversation with you of today, this is simply to confirm the fact that you will be sending us a letter this week telling us that you would like to exercise your options of the present labor agreement and open these options for negotiations. This is also to confirm our desire to do the same. We will be in touch with you to arrange a mutually acceptable time, place and date to begin these negotiations shortly.

Boykin did not respond to this letter.[3]

Because Boykin was experiencing health problems, the parties did not meet to negotiate a new collective bargaining contract until March 11, 1987. At that initial session, both the company and the Union contended that the other had opened negotiations, and neither party was prepared to present a proposal. The meeting concluded with the company stating that it would have a proposal ready for the next session.

The parties met again on March 17. The session began with Sam Derrick, Nabors Trailers' Comptroller, reviewing the company's economic status. Derrick stated that the company had incurred substantial losses during the preceding three years and that the company already had lost $1.7 million through the first three quarters of

---

**2.** Article 25 of the contract provided as follows:
   This Agreement shall be effective for a period of three (3) years from the date hereof, ... and from year to year thereafter, provided, however, that in the event either party desires to amend, change or terminate this Agreement, it shall give notice thereof at least sixty (60) days prior to the expiration date, or any anniversary date thereof. Upon the giving of such notice, the parties shall meet within ten (10) days for the purpose of negotiating a new Agreement. In the event of such notice and if no Agreement is reached by the expiration date, or anniversary date, either party may thereafter terminate this Agreement upon five (5) days written notice. . . .

**3.** On January 20, Boykin did finally send a letter to Blackmon, though it clearly was not the letter Blackmon had expected. In the letter, Boykin stated:
   Please accept my apology for having to cancel our planned meeting for the first of this week. I am undergoing an examination and a series of tests that may result in my being hospitalized for surgery.
   In the event all results prove negative, I will be back in touch with you to arrange a mutually acceptable time and date for a future meeting.

fiscal year 1987. Derrick indicated that in order to improve its economic condition, the company needed, among other things, to implement an average 28% reduction in the Union employees' wages. The company then presented the Union with a new job classification system and wage scale through which it could achieve the necessary wage reduction. The Union agreed to study the proposal and meet again the following day.

The parties began the March 18 negotiating session by discussing Nabors Trailers' economic condition, and the company reaffirmed its need for an average 28% wage reduction. In response to a request by the Union, the company then provided the specific wage rates that corresponded to the wage scale and job classification system that the company had supplied the previous day. The Union indicated that it would give the proposal further study and suggested that the parties meet the following week.

The collective bargaining contract was due to expire on March 22. On March 20, Blackmon delivered to the Union the company's five-day notice to terminate the contract.[4] Derrick testified that the purpose of this notice was to bring negotiations to a head as quickly as possible.

On March 23, Nabors Trailers sent a letter to the Federal Mediation and Conciliation Service (FMCS), notifying the agency that the company and the Union were engaged in negotiations over a new collective bargaining contract. On that same day, the parties met in a fourth negotiating session. During this meeting, the Union presented the company with a detailed proposal to amend the existing contract that included a 12% wage increase for the Union employees. After a brief caucus, the company suggested that the Union's proposal ignored Nabors Trailers' economic difficulties, and the focus of the discussion then shifted to the company's proposed job classification plan. The company provided the Union with a document indicating the number of employees needed in each job classification at each pay grade, and the parties discussed the factors that would account for the differences in job titles and pay rates. The Union then asked the company to provide it with details about how each of the current employees would be classified, both in terms of job title and wage scale. The company agreed to compile the information that evening.

The parties met in a fifth negotiating session the following afternoon. The company provided the job title and wage scale information the Union had requested the previous day. After a caucus, the parties discussed other possible changes to the collective bargaining contract but did not focus on wages. As the meeting drew to a close, the Union reduced its demand for a wage increase from 12% to 11%. Blackmon then asked the Union to present the company's wage proposal to the Union membership. Before adjourning, the parties agreed to meet again on March 31.

The Union representatives met with the workers after the close of business on March 24. The representatives distributed copies of the company's wage proposal to the workers. The representatives had written the workers' current salaries on the proposal so that the workers could compare their current with the proposed wage rates. Although the Union membership did not officially vote on the proposal, the Union representatives did take an informal poll, the results of which indicated that the workers would overwhelmingly reject the plan.

On March 25, the company found out the results of the previous evening's meeting of the Union membership. The company then decided to implement its wage propos-

---

4. The notice stated:

The unions and the company have been meeting for the purpose of negotiating the contract. The company submitted their proposal to the union at the bargaining table and the proposal was neither accepted, rejected, nor was a counter offer made by the union.

Since the contract officially terminates at the end of the day on March 22nd we must assume that no agreement was reached and the company hereby gives written notice to terminate the contract in five days....

al, and Blackmon posted the following notice to employees.

The Unions and The Company have been meeting for the purpose of negotiating the contract. The contract officially terminated at the end of the day on March 22nd but with the extension of a five day grace period as provided for in Article 25 of the contract.

On March 24th, The Unions voted not to accept the company's proposal.

There will be *NO* lockout and the plant *WILL* be open as usual on Monday, March 30th for those of you who wish to work. The new labor rates will go into effect at that time and they are posted on the Bulletin Board in the Clock House.

Union representatives were notified of the company's decision,[5] and on March 26 or 27, John Yates, who had replaced Boykin as the Union's chief negotiator, phoned Blackmon, urging him not to implement the wage reduction. Yates indicated that if the company insisted on implementing the plan, the Union would be forced to file unfair labor practice charges. This threat notwithstanding, Nabors Trailers implemented the job classification scheme and accompanying wage reduction on March 30.

The parties met as planned on March 31. Yates opened the session by again urging the company not to implement the wage reduction. Blackmon, however, stated that the Union employees were being paid the reduced wages as of the previous day.

The parties met six more times, in sessions on April 9, April 29, May 27, June 11, June 12, and October 21. Although a federal mediator attended and participated in each of these sessions, the Union and the company were unable to agree on terms for a new collective bargaining contract. When the parties met on October 21, Blackmon informed the Union that Nabors Trailers had received an offer to purchase the Mansfield facility and that he lacked authority to finalize an agreement. The parties agreed that given this state of affairs,

further discussions would be pointless. The plans to sell the facility apparently fell through, because in late November, the company informed the Union that "it may be necessary to discontinue manufacturing at this facility." Finally, by letter dated December 29, 1987, the company informed the Union of its decision "to cease manufacturing operations [at the Mansfield facility] on January 29, 1988." The bulk of the plant's operations were shut down as scheduled, though some employees were retained until March of 1988 to complete backlogged orders.

Several days after Nabors Trailers implemented the wage reduction, the Union filed unfair labor practice charges against the company, and on May 21, 1987, the Regional Counsel for the National Labor Relations Board issued a complaint. The case was tried before an administrative law judge (ALJ) in May of 1988, and the ALJ rendered his decision on September 27 of that year.

The ALJ determined that Nabors Trailers violated the National Labor Relations Act (the "Act") in two respects. First, Nabors Trailers improperly instituted the wage reduction without bargaining to impasse with the Union. Second, Nabors Trailers failed to comply with the notice requirements of section 8(d)(3) of the Act when it instituted the wage reduction less than thirty days after it informed the FMCS of the existence of ongoing collective bargaining negotiations. Based on these conclusions, the ALJ ordered the company to "[m]ake whole bargaining unit employees for any loss of earnings or benefits they may have suffered as a result of the unlawful reduction in their wage rates from March 30, 1987, until employees were laid off and the facility closed in January 1988."

The Board adopted the ALJ's findings of fact, conclusions of law, and recommended Order. The Board thereafter denied Na-

---

**5.** It is not clear that the company provided notice of its decision directly to Union representatives. Blackmon testified that he did not provide such notice. A Local President of the Union, however, testified that he was called into a meeting with Blackmon on March 25 and provided a copy of the notice to employees. In either case, it is clear that Union representatives had actual notice of the company's decision no later than March 27.

bors Trailers' motion for reconsideration and/or en banc review of the scope of the back pay award. The company then timely filed its petition for review in this court, and the Board filed its cross-application for enforcement of its Order.

## II.

### A.

The Board held that Nabors Trailers committed an unfair labor practice when it implemented the wage reduction before negotiations with the Union had reached an impasse. This holding was based on section 8(a)(5) of the Act, which provides that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5).

This circuit has held that there is no violation of the foregoing statutory rule, even in the absence of an impasse, if the employer notifies the union that it intends to institute the change and gives the union the opportunity to respond to that notice. In *National Labor Relations Board v. Citizens Hotel Co.*, 326 F.2d 501 (5th Cir. 1964), the court explained:

> It is true, of course, ... that an employer may make changes without the approval of the union as the bargaining agent. The union has no absolute veto power under the Act. Nor do negotiations necessarily have to exhaust themselves to the point of the so-called impasse. But there must be discussion prior to the time the change is initiated. An employer must at least inform the union of its proposed actions under circumstances which afford a reasonable opportunity for counter arguments or proposals.

*Id.* at 505 (citing *National Labor Relations Bd. v. Tex-Tan, Inc.*, 318 F.2d 472, 481 (5th Cir.1963)). In several cases decided since *Citizens Hotel*, the court has upheld the legality of employers' actions based on the bargaining obligation as formulated in that case, *see Winn–Dixie Stores, Inc. v. National Labor Relations Bd.*, 567 F.2d 1343, 1349 (5th Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 576, 58

L.Ed.2d 656 (1978); *National Labor Relations Bd. v. J.P. Stevens & Co.*, 538 F.2d 1152, 1162 (5th Cir.1976); *A.H. Belo Corp. v. National Labor Relations Bd.*, 411 F.2d 959, 970–71 (5th Cir.1969), *cert. denied*, 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970), and in several other cases the court has reaffirmed the continuing vitality of the *Citizens Hotel* standard, *see National Labor Relations Bd. v. Powell Elec. Mfg. Co.*, 906 F.2d 1007, 1013 n. 4 (5th Cir.1990); *Huck Mfg. Co. v. National Labor Relations Bd.*, 693 F.2d 1176, 1186 n. 15 (5th Cir.1982); *National Labor Relations Bd. v. Hondo Drilling Co.*, 525 F.2d 864, 867 (5th Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 78 (1976).

These cases confirm that the principles announced in *Citizens Hotel* are the law of this circuit. In affirming the vitality of the *Citizens Hotel* standard, we do not mean to suggest that the impasse standard is irrelevant to an evaluation of a company's alteration of employment terms. Indeed, to the extent a company has not complied with the requirements established by *Citizens Hotel* and its progeny, it may nevertheless escape an unfair labor practice charge if it can show negotiations were at an impasse when a change was implemented. *See Huck Mfg. Co.*, 693 F.2d at 1186 & n. 15. Our decision simply recognizes that the impasse and *Citizens Hotel* standards are distinct exceptions to the general rule that an employer's unilateral change in the terms and conditions of employment constitutes an unfair labor practice. *See id.*

Although Nabors Trailers apparently complied with the bargaining obligation established by the *Citizens Hotel* line of cases, the Board did not evaluate the legality of the company's actions in light of that standard. Accordingly, we must deny the Board's application for enforcement of its Order and remand this case for further proceedings. We do not reach the company's attacks upon the Board's "no impasse" finding.

### B.

The Board held that Nabors Trailers committed an unfair labor practice when it

implemented the wage reduction only one week after sending its March 23 letter notifying the FMCS that the Union and the company were involved in negotiations to modify the collective bargaining contract. This holding was based on the notification requirements established by section 8(d) of the National Labor Relations Act, which provides in part:

> [W]here there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—
>
> (1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof ...;
>
> (2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;
>
> (3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute ...; and
>
> (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later....

29 U.S.C. § 158(d).

The clear purpose of section 8(d)(3)'s notification requirement is to facilitate collective bargaining by giving the FMCS "sufficient time to intervene in an effective manner in advance of a stoppage of work, rather than after it has occurred, should the [FMCS] deem intervention necessary or desirable." *Local Union 219, Retail Clerks Int'l Ass'n v. National Labor Relations Bd.*, 265 F.2d 814, 818 (D.C.Cir.1959); *see National Labor Relations Bd. v. Mar-Len Cabinets, Inc.*, 659 F.2d 995, 998 (9th Cir.1981); *United Furniture Workers of Am. v. National Labor Relations Bd.*, 336 F.2d 738, 740–41 (D.C.Cir.), *cert. denied*, 379 U.S. 838, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964). The provision accomplishes this goal by requiring a party desiring termination or modification of a collective bargaining contract to notify the FMCS of the existence of a dispute within thirty days after delivering the notice required by section 8(d)(1). Following a timely section 8(d)(3) notice, the FMCS will have at least thirty days in which to facilitate the negotiation of a new contract, during which time both parties will be bound by the terms of employment in the existing contract. *See* 29 U.S.C. § 158(d)(1), (3)-(4).

A party to a collective bargaining contract could frustrate the purpose of section 8(d)(3), however, if it failed to deliver the required notice and then altered the terms of employment following expiration of the waiting period established by section 8(d)(4). Thus, although not explicitly required by the Act, several courts have held that if a party fails to deliver timely section 8(d)(3) notice, it may not alter the terms of the existing collective bargaining contract until thirty days after it has given such notice. *See National Labor Relations Bd. v. Weathercraft Co.*, 832 F.2d 1229, 1232 (10th Cir.1987); *Hooker Chem. & Plastics Corp. v. National Labor Relations Bd.*, 573 F.2d 965, 969 (7th Cir.1978); *United Furniture Workers*, 336 F.2d at 740–41. This reasoning is consistent with the spirit of section 8(d) generally and the purpose of section 8(d)(3) specifically, and we adopt it as our own. It would appear, therefore, that the Board properly determined that Nabors Trailers committed an unfair labor practice when it reduced the Union employees' wages less than thirty days after sending its March 23 letter.

Nabors Trailers, however, contends that it was not required to provide section 8(d)(3) notice and that it thus was free to implement the wage reduction as soon as the collective bargaining contract expired. The company's argument is based on a number of Board and appellate court decisions limiting the section 8(d)(3) notice obligation and the applicability of its corresponding timing requirements to the party that initiates bargaining. This interpreta-

tion of the Act was advanced in two Seventh Circuit decisions, in which that court held that the section 8(d)(1) and section 8(d)(3) notice requirements are "applicable only to the party initiating the dispute." *National Labor Relations Bd. v. Peoria Chapter of the Painting & Decorating Contractors of Am.*, 500 F.2d 54, 56 (7th Cir.1974); *see Hooker Chem. & Plastics Corp.*, 573 F.2d at 967. Because the noninitiating party has no obligation to provide section 8(d)(3) notice, "once the noninitiating party has observed its duty to bargain collectively during the sixty-day period subsequent to receiving notice, it has fulfilled its duty under § 8(d), whether or not the initiating party has met its obligation under § 8(d)(3) to notify state and federal mediators." *Peoria Chapter*, 500 F.2d at 58; *see Hooker Chem.*, 573 F.2d at 967–69. The Board subsequently adopted the Seventh Circuit's reasoning in *United Artists Communications, Inc.*, 274 N.L.R.B. No. 17, *petition for review denied*, 779 F.2d 552 (9th Cir.1985), *cert. denied*, 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986). In that decision, the Board explained the effect of its reasoning on the opportunity for FMCS intervention.

> [I]t is evident from a fair reading of Section 8(d) that the notice burdens of that provision fall exclusively, in the words of the statute, on 'the party desiring such termination or modification.' Although the participation of the mediation services is clearly an important and principal policy interest embodied in Section 8(d), we will not interpret the statute in a manner mandating a rigid and absolute 30–day mediation requirement when the initiating party possessing the notice burden has made no effort to satisfy its notice obligations and thereby has foreclosed the noninitiating party's right to resort to economic weapons or, as here, to implement new terms and conditions of employment.... We now hold that the burden of notifying the mediation services of a dispute under Section 8(d)(3) and (4) rests exclusively with the initiating party and that the initiating party's failure to file such a notice cannot serve to preclude the noninitiating party from undertaking otherwise lawful economic action.

*Id.* We will assume for purposes of this case that these decisions reflect an accurate interpretation of section 8(d). Thus, if Nabors Trailers was not the initiating party, it was not required to provide section 8(d)(3) notice and it was free to implement the wage reduction following expiration of the section 8(d)(4) waiting period. The focus of our analysis, therefore, must be on whether the Board properly determined that Nabors Trailers was the initiating party.

The Board held that "the responsibility for sending the notice required by Section 8(d)(3) [is assigned] to the party who 'initiates bargaining' by serving the notice referred to in Section 8(d)(1)." The Board concluded that in sending the January 19 letter, Nabors Trailers provided section 8(d)(1) notice and thus was properly viewed as the "initiating party." Nabors Trailers raises legal and factual challenges to the Board's holding.

Nabors Trailers first argues that the Board erred in defining the initiating party as the one that provides the section 8(d)(1) notice. The company suggests that the correct focus is on which party "starts the process" that results in collective bargaining. In support of its interpretation, the company relies on language from the *United Furniture Workers* decision, in which the court stated that section 8(d) "put[s] the responsibility for giving the required notices, under § 8(d)(3) as well as under § 8(d)(1), upon the party to the contract who raises the possibility of industrial conflict by moving to open up the existing contractual arrangements." *United Furniture Workers*, 336 F.2d at 741. The court went on to suggest that "Congress has made th[e] assignment [of the section 8(d)(3) notification obligation] and, not surprisingly, it is to the party who starts the process." *Id.* The company contends that the evidence in this case indicates that the Union initiated all discussions to open the collective bargaining contract, that the Union thereby started the collective bargaining process, and that the Union thus should

be viewed as the initiating party. We find Nabors Trailers' argument to be unpersuasive.

Congress has delegated to the Board the primary responsibility for interpreting and applying the Act. *See Ford Motor Co. v. National Labor Relations Bd.*, 441 U.S. 488, 496, 99 S.Ct. 1842, 1848–49, 60 L.Ed.2d 420 (1979). When in the course of its duties the Board is required to interpret the Act, a reviewing court should not reject that interpretation so long as the Board's "construction of the statute is reasonably defensible." *Id.* at 497, 99 S.Ct. at 1849, 60 L.Ed.2d 420. Thus, in attacking the Board's conclusion that the party that delivers section 8(d)(1) notice is the party that must also deliver section 8(d)(3) notice, the company must overcome a significant presumption in favor of the Board's interpretation of the Act. Nabors Trailers has failed to overcome that presumption.

In considering the company's argument, it is important to understand that under the Act, there is no "collective bargaining process" until a party to a collective bargaining contract delivers section 8(d)(1) notice. The parties to the contract may discuss the possibility of opening the contract for renegotiation and may even indicate that they intend to do so. As a matter of federal law, however, the parties are bound by the terms of the existing contract until the section 8(d) requirements are met. Because section 8(d)(1) notice is the initial step in the fulfillment of these requirements, as a practical matter there is no collective bargaining process until such notice has been delivered.

Because the giving of section 8(d)(1) notice is the initial step in collective bargaining, it simply makes no sense to argue, as Nabors Trailers does, that the party who "starts the process" need not be the same party who gave that section 8(d)(1) notice. The Board's interpretation not only is defensible, but is also the most logical construction of the Act. The Board properly held that the initiating party is the party who delivers section 8(d)(1) notice.

Nabors Trailers next argues that the Board erred in concluding that the company provided section 8(d)(1) notice. The company suggests that in sending its January 19 letter, it was acting as the agent for the Union, confirming negotiations that the Union already had opened. This argument is frivolous. Nabors Trailers had no authority to act on the Union's behalf, and the Union could open negotiations only by delivering to the company written notice of its desire to open the contract, which it never did. The Board properly determined that Nabors Trailers initiated bargaining and thus was obligated to give section 8(d)(3) notice. Accordingly, we sustain the Board's conclusion that Nabors Trailers committed an unfair labor practice when it implemented the wage reduction less than thirty days after informing the FMCS that negotiations were ongoing.

The Board's application for enforcement of its Order is DENIED. The case is REMANDED for proceedings consistent with this opinion.