**COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, Plaintiff-Appellant,**

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY, Defendant-Appellee.**

**No. 81–2440.**

United States Court of Appeals, Fifth Circuit.

Sept. 6, 1983.

Robert W. Rickard, Houston, Tex., for plaintiff-appellant.

Eduardo Roberto Rodriguez, Brownsville, Tex., Melanie S. Fannin, San Antonio, Tex., for defendant-appellee.

Before GARZA, REAVLEY and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

As a matter of procedure this case is an appeal from the district court's denial of appellant's Application for Confirmation and Enforcement of an Arbitration Award.

This Court, however, must actually only determine whether the district court's interpretation of a wholly separate document, the so-called Local Overtime Agreement and its duration clause, was correct.

Plaintiff-appellant, the Communications Workers of America, AFL–CIO ("the Union"), and defendant-appellee, Southwestern Bell Telephone Company ("the Company"), share a long history of collective bargaining. The most recent collective bargaining agreements between the Union and the Company have been negotiated triennially.

On August 7, 1977, the Union and the Company entered into a triennial collective bargaining agreement which contained an arbitration clause.[1] On December 7, 1977, the parties entered into a supplementary agreement concerning practices and procedures regarding overtime in the Corpus Christi Division, which included the Rio Grande Valley. This supplementary agreement, which contained no statement as to when it would terminate, was known as the Corpus Christi Local Overtime Agreement ("the Local Overtime Agreement").

In August 1978, the Company suspended twenty-eight employees as a result of a dispute concerning the assignment of overtime. The Union filed an unfair labor practice charge with the National Labor Relations Board ("the NLRB"). The charge contended that the Company's conduct had violated sections 8(a)(1) and 8(a)(5)[2] of the National Labor Relations Act ("the NLRA"). As a result, the Regional Director of the NLRB issued a complaint against the Company. After a hearing had begun, the Union and the Company entered

into a settlement agreement which stated, in part, that the terms of the Local Overtime Agreement:

" . . . [A]re, and shall remain, in force and effect, and shall be enforceable by either party; and shall not be abridged, modified, or terminated unless and until the parties agree otherwise in the course of collective bargaining.

"It is agreed and understood that either party may give notice of intent to terminate or modify this agreement on August 9, 1980 in the manner provided for by section 8(d) of the National Labor Relations Act."

The settlement agreement, then, by incorporation, in effect added a duration clause to the Local Overtime Agreement.

Alleging that the Company's actions had violated the Local Overtime Agreement, the Union also filed grievances protesting the aforementioned twenty-eight suspensions. The grievance procedure failed to resolve the dispute between the parties. The parties submitted the contested matters to arbitration in accordance with the procedures set forth in the 1977 triennial collective bargaining agreement. Arbitrator James C. Vadakin, selected by the parties, held hearings, and on May 16, 1980, the Union and the Company reached an agreement in settlement of the dispute. Vadakin issued an award embodying the terms of that settlement agreement on June 16, 1980. The agreement provided in part:

"6. The Company reaffirms the agreement set forth herein as Joint Exhibit 3[.]"

Joint Exhibit 3, attached to the arbitration award, contained the settlement agreement

---

**1.** The arbitration clause stated that if after the completion of all steps of the formal grievance procedure, the Union and the Company still differed as to (1) the meaning of any provisions of the collective bargaining agreement, (2) the application of a provision to employees, (3) the dismissal of employees who had worked at least one year, or (4) the disciplinary supervision for just cause of any employee, the parties would submit the issues to arbitration.

**2.** Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and 29 U.S.C. § 158(a)(5), provide:

"(a) It shall be an unlawful labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

" . . . .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

reached in the sections 8(a)(1) and 8(a)(5) case which had been before the NLRB. In other words, through provision six of the arbitration award, the Company reaffirmed the duration clause, which the settlement agreement had added to the Local Overtime Agreement.

On May 27, 1980, after the parties had reached their agreement over the arbitrated claim, but before Vadakin had issued the award, the Company, by letter, notified the Union of the Company's intent to terminate the Local Overtime Agreement on August 9, 1980. The Company did not notify the Federal Mediation and Conciliation Service ("the FMCS") or the Texas Department of Labor of the Agreement's upcoming termination, nor did it offer to meet and confer with the Union for the *specific* purpose of negotiating a successor contract to the Local Overtime Agreement.

In July 1980, the Union and the Company began negotiations for a new triennial collective bargaining agreement to succeed the 1977 triennial agreement. During these negotiations, the matter of the Local Overtime Agreement arose. The parties were at odds as to how the duration clause of the Agreement was to be interpreted. The Company maintained that because it had given the Union its timely notice of intent to terminate the Agreement, the Agreement would terminate on August 9. Hence, if it wanted the Agreement to continue, the Union would have to negotiate the Agreement into the 1980 collective bargaining agreement.

The Union, on the other hand, maintained that the Company's notice to terminate would not effectively terminate the Local Overtime Agreement. The Union contended that the duration clause directed that the Local Overtime Agreement could only be modified or terminated by agreement of the parties during collective bargaining. Because the Union had not agreed to the Agreement's termination, the Union asserted that the Company's notice was ineffective and that the Local Overtime Agreement continued in force. During the bargaining for the 1980 triennial agreement, the Union refused to alter or modify the Local Overtime Agreement.

In August 1980, the parties entered into a new triennial collective bargaining agreement. Although the new agreement contained a provision limiting the number of hours of overtime that the Company could assign, no provision concerned the procedure to be used to assign overtime, which had been the subject of the Local Overtime Agreement.

The 1980 triennial agreement also contained a prior agreements clause which stated, "This Agreement supersedes and cancels the 1977 Departmental Agreement and all amendments and supplements thereto."

Never having agreed on the interpretation of the Local Overtime Agreement's duration clause, the Company treated the Local Overtime Agreement as terminated after August 9, 1980, while the Union asserted the Agreement's continued vitality. In January 1981, in response to the Company's alleged violations of the Local Overtime Agreement, the Union filed a Complaint and Application for Confirmation and Enforcement of an Arbitration Award. The award involved in the complaint and application was the Vadakin arbitration award which had primarily resolved the issues regarding the suspensions of employees who had refused to work overtime. The complaint, however, only concerned the award's sixth provision, which had affirmed the Local Overtime Agreement as modified by the settlement agreement's duration clause. The Union alleged that the arbitration award, by its reaffirmation, required that the settlement agreement and Local Overtime Agreement remain in full "force and effect . . . until the parties agree otherwise in the course of collective bargaining," as the first phrase of the duration clause stated. The complaint did not construe the second sentence of the duration clause.

The Union, in essence, alleged that by treating the Local Overtime Agreement as terminated, without having obtained the Union's assent in the course of collective bargaining, the Company had violated the Vadakin arbitration award reaffirmation of the Local Overtime Agreement's duration clause.

The district court, construing the duration clause, 524 F.Supp. 1031 (S.D.Tex. 1981), found that the clause had given the Company the power to unilaterally terminate the Local Overtime Agreement by giving the Union notice, in compliance with section 8(d) of the NLRA, of its intent to terminate. The court then found that because the Company's notice had complied with section 8(d), the Company had effectively terminated the Local Overtime Agreement as of August 9, 1980. Because the Agreement had terminated in August, the "reaffirmation" of the duration clause which the Company had made in the June 16, 1980 arbitration award had been ineffective beyond August 9, 1980. Any "violations" of the Local Overtime Agreement after August 9 had not constituted a breach of the "reaffirmation" in the arbitration award. Accordingly, the district court denied the Union's complaint and application to enforce the award.

This Court is faced with the same two questions the district court decided.[3] First, we must determine whether the Company had the power to unilaterally terminate the Local Overtime Agreement. If we find that the Company could unilaterally effect a termination, we must decide whether the actual actions taken by the Company conformed to the requirements of section 8(d) and thereby effectively terminated the Agreement.

We readily agree with and affirm the district court's determination that the Company had the power to unilaterally terminate the Local Overtime Agreement. The district court's construction of the Agreement was not in error.

Again, the germane sentences of the duration clause state that the terms of the Local Overtime Agreement:

"[I] ... [A]re, and shall remain, in force and effect, and shall be enforceable by either party; and shall not be abridged, modified, or terminated unless and until the parties agree otherwise in the course of collective bargaining.

"[II] It is agreed and understood that either party may give notice of intent to terminate or modify this agreement on August 9, 1980 in the manner provided for by section 8(d) of the National Labor Relations Act."

The Union argues that the second sentence did not grant a party the power to unilaterally terminate the Agreement through notice, but simply provided a means by which a party could open up negotiations. Under the Union's construction, the section 8(d) notice to terminate only provided the method for one party to inform the other that it *desired* to terminate the Agreement. Actual termination could not have taken place, the Union contends, until both parties had agreed to the termination, in the course of collective bargaining, as the first clause provided.

■ The Union's construction perverts the plain meaning of the phrases of the duration clause. The phrase "intent to terminate" is a term of art in the labor field. A party giving notice of its intent to terminate has not simply expressed a desire. Instead, its notice is effective to terminate the contract on the date specified. *Local 350, United Association of Journeymen v. Slayden*, 91 L.R.R.M. (BNA) 2272, 2274 (N.D. Cal.1975). *See also Ted Hicks and Associates, Inc.*, 232 N.L.R.B. No. 113, 97 L.R.R.M. 1500 (1977), *enforced sub nom., Ted Hicks and Associates, Inc. v. NLRB*, 572 F.2d 1024 (5th Cir.1978) (per curiam). It is inconceivable that these parties, with their long history of and great experience in collective bargaining would have chosen these specific words—"notice of intent to terminate"—to carry a meaning contrary to their customary usage. The record is devoid of evidence

---

**3.** This Court has been reluctant to construe arbitration awards which are ambiguous. Instead, we have remanded cases concerning the enforcement of those awards to the arbitrator with instructions that he or she clarify the award. *United Steelworkers v. W.C. Bradley Co.*, 551 F.2d 72, 73 (5th Cir.1977); *San Anto-*

*nio Newspaper Guild, Local No. 25 v. San Antonio Light Division*, 481 F.2d 821, 824–25 (5th Cir.1973).

Because neither party contends that the arbitration award is ambiguous and because we do not find it patently so, we do not remand this case to the arbitrator.

which might suggest that at the bargaining table the parties had understood these words to mean "notice of desire to terminate." Without any evidence that the words were to have had a uniquely uncustomary meaning, we assume that the parties used the words to conform to their plain meaning in this context. By giving a party the right to give notice of intent to terminate the Local Overtime Agreement on August 9, 1980, the phrase granted the party the power to effectively terminate the Agreement via its notice.

A glance at the dates referenced in the 1977 triennial agreement and the Local Overtime Agreement bolsters our interpretation. The 1977 triennial agreement was to expire on August 9, 1980. The Local Overtime Agreement provided that either party could give notice of its desire to terminate that Agreement on August 9 in the manner provided for by section 8(d) of the NLRA. Because the 1977 agreement's expiration date coincided with the date in the Local Overtime Agreement, we are led to the conclusion that the parties contemplated that the August 9 date on which the 1977 agreement would expire seemed a wise time to allow either party to opt out of the Local Overtime Agreement. Notice of intent to terminate would accomplish that option.

The Union urges that interpreting the second phrase to have given a party the power to unilaterally terminate the Local Overtime Agreement renders the first phrase of the duration clause meaningless. We find otherwise. We read the first clause as having provided the parties with a method by which they could have terminated or modified the Agreement before August 9. If one party had wished to extricate itself from the Agreement before August 9, 1980, it could not have done so unilaterally, but would have had to obtain the other party's consent in the course of collective bargaining.

We hold that the district court did not err in finding that the Company had the power to unilaterally terminate the Local Overtime Agreement by giving notice in compliance with section 8(d).[4] We now confront

4. Even were we to accept the Union's reading of the duration phrases, the Company nevertheless would likely have had the legal power to unilaterally terminate the Agreement through reasonable notice to the Union.

The Union argues that under the first phrase, the parties agreed that the Agreement would remain in effect until both parties consented to its modification or termination. Agreements in this area, however, which can only be terminated through the mutual consent of the parties, are generally considered to be of indeterminate duration. As we have explained:

"It is inconceivable that either party, wishing to avoid a breakdown of labor-management relations would have intended that the contract continue in force unless efforts to change the contract were successful, or unless both sides wanted to terminate the contract. The side *not* desiring a change could refuse to agree, within the confines of the Labor-Management Relations Act's proscription against refusals to bargain. Each side could stand entrenched knowing the contract would continue as it was. The side desiring to alter the terms or conditions of the relationship would never have a prayer of success." *Kaufman and Broad Home Systems, Inc. v. International Brotherhood of Firemen and Oilers, AFL–CIO*, 607 F.2d 1104, 1110 (5th Cir.1979) (quoting *Local 35, United Association of Journeymen v. Slayden*, 91 L.R. R.M. (BNA) 2272, 2273–74 (N.D.Cal.1975)).

Under the Union's reading, then, that the Local Overtime Agreement provided for termination only by the mutual consent of the parties, the Agreement was likely one of indeterminate duration. Labor contracts of indeterminate duration are generally terminable at will upon reasonable notice to the other party. *Boeing Airplane Co. v. NLRB*, 174 F.2d 988, 991 (D.C.Cir.1949); *Trustees of the Atlanta Iron Workers Local 387 Pension Fund v. Southern Stress Wire Corp.*, 509 F.Supp. 1097, 1105 n. 12 (N.D.Ga.1981); *Eastern District Council of the United Brotherhood of Carpenters and Joiners v. Blake Construction Co.*, 457 F.Supp. 825, 830 (E.D.Va.1978).

Even under the Union's analysis of the wording, then, the Local Overtime Agreement was likely one of indeterminate duration. As such, it would normally be terminable at will upon reasonable notice to the other party. The district court found that notice which complied with section 8(d) was reasonable notice. Because the duration clause contemplated the parties' use of section 8(d) notice, we infer that the parties believed section 8(d) notice was reasonable. Therefore, if the Company complied with section 8(d), it likely had the legal power to unilaterally terminate the contract, even if the Union's reading of the duration clause's wording were correct.

the question of whether the Company's notice was sufficient to terminate the Agreement. The district court held that it was and we agree.

The Agreement provided that notice to terminate should be given in accordance with section 8(d) of the NLRA, 29 U.S.C. § 158(d), which provides in part:

"That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

"(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territory agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

"(4) continues in full force and effect, without resorting to strike or lockout, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until

the expiration date of such contract, whichever occurs later[.]"

The Union does not argue that the Company failed to comply with sections 8(d)(1) or 8(d)(4). Indeed, the record shows that the Company complied with section 8(d)(1) by giving the Union written notice of its intent to terminate sixty days before August 9, 1980, and that the Company complied with section 8(d)(4) by adhering to the terms of the Agreement until August 9, 1980. Instead, the Union contends that because the Agreement's termination was dependent on a party's fulfilling all the requirements of section 8(d), the Company's failure to comply with sections 8(d)(2) and 8(d)(3) extended the Local Overtime Agreement beyond August 9, 1980.[5]

We agree with the district court's conclusions that the Company constructively complied with section 8(d)(2). The date the Local Overtime Agreement could be terminated, August 9, 1980, was the same date the 1977 collective bargaining agreement was to expire. Because the parties chose August 9 as a possible termination date for the Local Overtime Agreement, we infer that the parties contemplated that negotiations regarding that Agreement would take place concurrently with the negotiations for the new triennial collective bargaining agreement. Although the Company made no offer prior to August 9 to *specifically* negotiate the Local Overtime Agreement then, we believe the purpose of section 8(d)(2) was served. The Company's notice of intent to terminate the Local Overtime Agreement on August 9 must have put the Union on notice that negotiations regarding the Agreement would be subsumed into the upcoming negotiations for the triennial agreement. Beyond this, the Company was available and willing at

---

**5.** As noted, the 1980 triennial bargaining agreement contained the following prior agreements clause: "This Agreement supersedes and cancels the 1977 Departmental Agreement and all amendments and supplements thereto." The Union's complaint refers to the Local Overtime Agreement as "supplemental"; presumably, it supplemented the 1977 triennial collective bargaining agreement. The fact that the Union

entered into the 1980 triennial agreement which contained the prior agreements clause goes against its allegation that it believed the Local Overtime Agreement was still alive. A strict reading of the prior agreements clause would lead to the conclusion that the 1980 triennial agreement superseded the supplementary Local Overtime Agreement.

the collective bargaining sessions to discuss the Local Overtime Agreement, and the evidence shows that that Agreement was discussed. *See also* note 5, *supra.* Under these circumstances, we affirm the district court's holding that the Company complied with section 8(d)(2).

■ The Union's only substantially arguable claim is under section 8(d)(3). That section requires that a party "desiring" the termination of an agreement notify the FMCS and the equivalent state labor agency within thirty days after giving the other party its notice of intent to terminate. The Company neglected to notify both the FMCS and the Texas Department of Labor.[6]

The Union makes no claim that the Company committed an unfair labor practice by neglecting to notify the agencies. It simply urges that the Company's neglect rendered its attempt to terminate the contract ineffective. Although the failure to notify the labor agencies may be a breach of the duty to bargain collectively under section 8(d),[7] the sole question before us is whether the effect of the Company's failure was to extend the contract. We find that it was not.

Section 8(d) is known as the "cooling off" provision, and its purpose is to give parties to an expiring contract sixty days to work out their differences, free from threats of strike or lockout. *See* section 8(d)(4) which states that a strike or lockout during the sixty days after notice is given breaches the duty to bargain collectively; *i.e.,* is unlawful. *See also United Furniture Workers v. NLRB,* 336 F.2d 738 (D.C.Cir.), *cert. denied,* 379 U.S. 838, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964).

The district court held that the Company's section 8(d)(3) duty to notify the FMCS and the Texas Department of Labor would only have arisen if a strike or lockout had been threatened. Because no threat of strike had existed here, the court found that the Company had been excused from notifying the agencies. Its failure to have notified the services did not taint the Company's compliance with section 8(d).

For support, the district court looked to *Procter & Gamble Independent Union v. Procter & Gamble Manufacturing Co.,* 312 F.2d 181 (2d Cir.1962), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963), which held that the failure to comply with section 8(d)(3) had no effect on section 8(d)(4), and noted, "The requirement of notifying the federal and state mediation services is a subordinate feature of the plan. They are to be notified so that where there is a threat of strike they may have the opportunity of entering into the negotiations and trying to bring about a peaceful settlement." *Id.* at 188.

The district court also cited *Allied Chemical and Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 187, 92 S.Ct. 383, 401, 30 L.Ed.2d 341 (1971):

"The structure and language of § 8(d) point to a more specialized purpose than merely promoting general contract compliance. The conditions for a modification or termination set out in paragraphs (1) through (4) plainly are designed to regulate modifications and terminations so as to facilitate agreement in place of economic warfare. Thus, the party desiring to make a modification or termination is required to serve a written notice on

---

**6.** We note that the Local Overtime Agreement's duration clause states that "*either party may give notice of intent to terminate or modify* this agreement on August 9, 1980 in the manner provided for by section 8(d) of the National Labor Relations Act." The clause does not expressly say anything about notifying the services in the manner provided for by section 8(d); one might well infer that the notice referred to is merely notice to the other party. The wording of the clause does not necessarily suggest that notification of the

services was a prerequisite to termination of the contract.

**7.** "[T]he duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring termination or modification—

"....

"(3) notifies the Federal Mediation and Conciliation Service ... and ... notifies any State or Territory agency established to mediate and conciliate."

the other party, offer to meet and confer, notify mediation and conciliation services *if necessary,* and meanwhile maintain contract relations." (Emphasis added.)

Although we could infer from these cases that a party need only notify the mediation agencies if it perceives a threat of strike or lockout in reaction to the party's notice to modify or terminate, we need not here determine that question. We observe that the language of section 8(d) simply commands that a party notify the mediation services within thirty days after it gives its notice of intent to the other party. The language does not necessarily suggest that the duty to notify the services is dependent on a party's perception of a threat of strike or lockout. It is arguable that the policy behind section 8(d)(3)—to give the mediation services notice of *potential* labor contract disputes, and the opportunity to intervene in the negotiation process—could to some extent be subverted if the parties to the labor contract were given the discretion to notify the services only when they determined that a threat of strike or lockout did exist.

Aware that the *result* the district court reached was correct—that the Company's notice to terminate the contract was effective although the Company failed to notify the FMCS and the Texas Department of Labor—but finding it unnecessary to rule as broadly in this respect as did the district court, we instead simply hold that although the failure to notify federal and state mediation services might have ramifications in certain other contexts or for other purposes, such failure will not serve to extend a contract which could be terminated via section 8(d) notice.

Cases concerning the adverse consequences which befall a party who is required to comply with section 8(d)(3) and fails to do so are few. The cases generally concern the legality or illegality of strikes and lockouts initiated in situations in which the mediation services were never notified, or were given untimely notice of a contract's termination. The contracts in these cases expired, although no notice to the services had been given. No court even suggested that the effect of a party's failure to notify the mediation service was to extend the term of the collective bargaining agreement. *See Hooker Chemicals & Plastics Corp. v. NLRB,* 573 F.2d 965 (7th Cir. 1978); *NLRB v. Peoria Chapter of the Painting & Decorating Contractors,* 500 F.2d 54 (7th Cir.1974); *Procter & Gamble Independent Union v. Procter & Gamble Manufacturing Co., supra; Local Union 219, Retail Clerks International Association v. NLRB,* 265 F.2d 814 (D.C.Cir.1959); *International Union of Operating Engineers v. Dahlem Construction Co.,* 193 F.2d 470 (6th Cir.1951). *See also NLRB v. Mar-Len Cabinets, Inc.,* 659 F.2d 995 (9th Cir.1981).

The NLRB has found that a party's failure to comply with the notice requirements of sections 8(d)(1) and 8(d)(3) did not effect a renewal of an automatically renewable contract. *Crowley's Milk Co.,* 79 N.L.R.B. 602 (1948). *See also* R. Gorman, *Basic Text on Labor Law* 427 (1976). Also, the Second Circuit has specifically found that a union's failure to give timely notice to the mediation services did not have the effect of extending the period of the expired contract. *Procter & Gamble Independent Union v. Procter & Gamble Manufacturing Co.,* 312 F.2d at 189. *See also Ottley v. Sheepshead Nursing Home,* 688 F.2d 883, 890 (2d Cir.1982).

The legislative history of section 8(d) and its judicial construction also dictate the conclusion that a party's failure to notify the mediation services does not extend the contract which the party is attempting to terminate. A perusal of the legislative history reveals no suggestion that a party's failure to notify the mediation services about a terminating contract would result in the extension of that labor contract. As the court stated in *Local Union 219, Retail Clerks International Association v. NLRB,* 265 F.2d at 818, "the whole thrust of the section [8(d)(3)] is to give the Service [FMCS] sufficient time to intervene in an effective manner . . . ." The Seventh Circuit has quoted with approval a Senate Report, Joint Comm. on Labor-Management Relations, Final Report, S.Rep. No. 986, Pt. 3, 80th Cong., 2d Sess. 15 (1948):

" 'The act emphasizes an equally important function of mediation and conciliation, which is prevention of disputes that, without such preventive effort, would be apt to arise. Prevention of disputes has continued to be a major program of the new [FMCS]. The Service has been greatly assisted in this program by the fact that under Section 8(d)(3), a party desirous of modifying or terminating its contract *must notify the Service 30 days before resorting to a strike or lockout* .... In the days before the 30-day notice was required, strikes frequently occurred before the ... Service had any knowledge that there was a dispute. Mr. Chaing [then Director of the FMCS] believes that in many instances the early intervention of conciliators has prevented a strike.' " *Hooker Chemicals & Plastics Corp. v. NLRB,* 573 F.2d at 968 (emphasis and omissions in original).

From the legislative and jurisprudential history of section 8(d), and particularly of section 8(d)(3), we must conclude that, in requiring that the party desiring to terminate a contract notify the mediation services, Congress intended only to facilitate the intervention of the FMCS when needed in contract disputes. We do not believe Congress meant to enact section 8(d)(3) as a hurdle over which a company (or union) must jump to effectively terminate a contract if it has timely notified its union (or company) of its intent to terminate. Accordingly, we hold that the Company's failure to notify the FMCS and the Texas Department of Labor did not extend the Local Overtime Agreement, at least so far as concerns the mutual rights and obligations of the contracting parties to each other under the contract itself. Certainly the Union, which *was* notified, could have notified the services itself, had it so desired. There is no suggestion that under the circumstances there was prejudice to any party on account of the services not being notified, or that there was any practical need for such notification. Because the Company's actions terminated the Local Overtime Agreement, we find, as the district court did, that "the fact that the Company had, prior to this, reaffirmed the agreement in the agreed [arbitration] award, fails to impart any life or extra significance to that agreement." 524 F.Supp. at 1034. Because the Company has not breached the arbitration award's provision six which reaffirmed the Local Overtime Agreement, the district court's order denying the Union's Application for Confirmation and Enforcement of an Arbitration Award is affirmed.

AFFIRMED.