# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2934

_____

National Labor Relations Board,     *
                                *

          Petitioner,         *
                                *

      v.                          *    On Application for
                                *    Enforcement of an Order of the

Whitesell Corporation,        *    National Labor Relations Board.
                                *

         Respondent.       *
                                *

_____

Submitted: March 15, 2011
Filed: April 22, 2011

_____

Before SMITH, ARNOLD, and SHEPHERD, Circuit Judges.

SHEPHERD, Circuit Judge.

The National Labor Relations Board ("NLRB" or "the Board") petitions for enforcement of its order finding that Whitesell Corporation ("Whitesell") violated various provisions of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-69, while negotiating a new collective-bargaining agreement ("CBA") with the Glass, Molders, Pottery, Plastics, and Allied Workers International Union, AFL-CIO ("Union"). Whitesell opposes enforcement on the ground that the NLRB lacked jurisdiction to enter a "new" decision following this court's denial of the NLRB's prior application for enforcement. In the alternative, Whitesell challenges, for lack

of substantial evidence, the NLRB's determinations that Whitesell failed to (1) bargain in good faith to impasse; (2) give the required timely notice to the Federal Mediation and Conciliation Service ("FMCS"); and (3) bargain in good faith by failing to provide information requested by the Union while negotiating the new CBA.

I.

In January 2005, Whitesell purchased Fansteel Washington Manufacturing, Inc., a wire manufacturer in Washington, Iowa. Pursuant to the purchase, Whitesell recognized the Union that had represented the plant's production and maintenance employees for more than 40 years and adopted the existing CBA, which was set to expire on June 12, 2006. The employees at Whitesell's other facilities do not have union representation. The expiring CBA contained a dues-checkoff provision (whereby the employer withholds union dues from the employee's wages and pays them to the union), imposed a "just cause" limitation on employee discipline, based layoff and recall on seniority, and set vacation entitlements on years of service. The CBA also included a yearly wage increase of $0.25 per hour, a defined contribution pension plan, medical coverage, group life insurance, and a voluntary supplemental accident fund. In addition, the CBA defined the workweek as Monday to Friday, with overtime pay for Saturday and Sunday, and limited the probationary period for new employees to 60 days.

On March 2, 2006, Whitesell's human resources manager, Cris Libera, sent the Union a letter, declaring Whitesell's "intent to terminate" the CBA upon its expiration on June 12, 2006. Attached to this letter was a copy of the F-7 form that a party seeking to modify or terminate a CBA must file with the FMCS within 30 days of notifying the other party of the dispute. See 29 U.S.C. § 158(d)(3). However, the FMCS never contacted the parties, a fact that both sides noted was odd during the subsequent negotiations. When Union negotiator Dale Jeter contacted the FMCS to

request a mediator on July 10, almost a month after Whitesell declared impasse and ended the negotiations over the new CBA, the FMCS replied that it had no knowledge of the dispute. Although Whitesell claims it mailed the F-7 form on March 2, the same day it sent the letter to the Union, the FMCS did not receive an F-7 form from Whitesell until August 11.

On May 1, 2006, Whitesell negotiator Robert Janowitz provided Jeter with the company's initial proposal for a new CBA. Janowitz also informed Jeter that Whitesell would not negotiate beyond the existing CBA's expiration on June 12, 2006. Whitesell's stated intention was "to negotiate a new agreement from start to finish" and "to equalize labor costs with that of other [non-union] locations and facilities." Accordingly, Whitesell proposed a number of significant changes, including: elimination of the dues-checkoff provision; elimination of the provision prohibiting the company from discriminating against union members when making employment decisions; replacement of the "just cause" provision with a requirement that the Union demonstrate that Whitesell acted arbitrarily; elimination of Union representation at disciplinary meetings other than those regarding termination or suspension; imposition of Whitesell's unilateral right to change any policy or procedure affecting overtime pay, holidays, vacations, and sick pay, in accordance with the company's practice at its other facilities; extension of the probationary period for new employees to 90 days; and consideration of factors in addition to seniority for layoffs and recalls.

Beginning on May 26, the parties held eight bargaining sessions. The first and last sessions did not involve substantive bargaining. The Union presented its initial proposals to Whitesell on May 26, which included a yearly wage increase of $1 per hour, two additional holidays, and increases in the company's defined pension contributions, sickness, and accident benefits. At the first session, Janowitz reiterated Whitsell's intention not to negotiate beyond the expiration of the existing CBA on June 12. At the second meeting on June 6, Whitesell provided Jeter with the specifics

of the company-wide policies that it proposed to implement. These included the replacement of the Union-defined contribution pension plan with the company's 401(k) plan,[1] a four- or five-fold increase in the insurance premiums for employees with less than ten years of service, an increase in the number of years of service required for certain vacation benefits, and a decrease in the number of paid holidays from ten to eight days. Jeter requested more information about the proposed vacation policy, which he estimated would cause approximately one-third of his bargaining unit to lose vacation benefits. Whitesell disagreed with Jeter's estimate and rejected the Union's proposal to grandfather in the employees who would lose accrued vacation benefits under the new plan. Whitesell's proposal also eliminated overtime pay for weekend work.

At the third meeting on June 7, Whitesell proposed for the first time replacing annual wage increases with a merit-based system based on annual performance reviews. At the fourth meeting on June 8, Whitesell provided Jeter with cost estimates for employees participating in its various benefit programs and asked the Union to propose a final offer. At the fifth meeting on June 9, Whitesell offered a modified wage proposal, whereby it would increase wages by $0.25 per hour for the first year of the CBA and increase the shift differentials for those working second and third shifts. Whitesell also conceded that the Union could represent employees during performance evaluations. Although the parties agreed on several of Whitesell's proposals, the Union requested that the existing CBA be extended until July 16 to provide the Union with time to understand some of Whitesell's more substantial changes. In particular, Jeter requested information regarding the impact of the company's proposed vacation plan. The company refused to delay the expiration date of the existing CBA. At the sixth meeting on June 10, the Union

---

[1]Under the existing pension, the company contributed $0.84 per regular hour. Under the proposed 401(k), Whitesell would provide a 25% match on employee contributions up to 8% of annual compensation and the employee would not become fully entitled to the employer's contributions until the sixth year of employment.

lowered some of its wage demands and indicated that it would be willing to accept a modified merit-pay system. However, the Union reiterated its objection to some of Whitesell's proposals. With regard to the company's proposal to replace the "just cause" standard for employee discipline with a prohibition on "arbitrary action" by the company, Jeter told Whitesell's negotiator that the Union would never accept such a standard and that this was the Union's "final position."

The last substantive bargaining between the parties took place at the seventh meeting on June 11. At this meeting, the parties agreed on a number of important issues. In exchange for Whitesell's acceptance of the Union's dues-checkoff proposal, the Union accepted Whitesell's proposals on holiday, vacation, and funeral leave. Whitesell also made a counterproposal on seniority. On June 12, the expiration date of the existing CBA, Whitesell presented its final offer after the Union agreed to adopt the company's proposed health insurance plan. Jeter was dissatisfied with the offer and refused to present it to Union membership for a vote. Later that evening, Jeter requested further negotiations. Whitesell refused, declaring that the negotiations were at an impasse. At this time, the parties had reached tentative agreements on approximately 30 issues.

Whitesell then implemented selected portions of its final offer. However, despite Whitesell's inclusion of the Union's dues-checkoff provision in its final offer, Whitesell stopped collecting Union dues after June 12. Whitesell also canceled a voluntary accident program and refunded the money to employees who had contributed, even though cancelling the program had not been one of the terms presented in the company's final offer. In addition, Whitesell prohibited Union members from using their break and unpaid time to post notices about Union meetings on the company's bulletin boards.

The Union subsequently filed a complaint. After an administrative law judge ("ALJ") determined that the company had committed several violations of the NLRA,

Whitesell appealed these findings to the NLRB. The NLRB, at that time consisting of only two members, adopted a number of the ALJ's findings. First, the NLRB found that Whitesell had violated section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), by prohibiting Union members from posting notices about Union meetings on company bulletin boards during their break and unpaid time. Second, the NLRB found that Whitesell violated section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5), by terminating the existing CBA and implementing portions of its final offer without providing notice to the FMCS as required by section 8(d)(3) of the NLRA, 29 U.S.C. § 158(d)(3). Third, the NLRB found that Whitesell violated section 8(a)(5) by failing to provide relevant information requested by the Union concerning Whitesell's administration of the merit-pay proposal at the company's other facilities and by failing to provide information concerning the impact of Whitesell's vacation proposal.[2] Fourth, the NLRB determined that Whitesell had violated sections 8(a)(1) and (a)(5) by unilaterally implementing certain provisions of its final offer without first bargaining to a valid impasse.

Based upon these findings, the NLRB ordered Whitesell to cease and desist from its termination of the previous CBA and to restore the previous CBA until the parties sign a new agreement or, in good faith, reach a valid impasse. The NLRB petitioned this Court for enforcement of the order. After briefing and presentation of oral argument but before the filing of an opinion, the Supreme Court held in New Process Steel, L.P. v. NLRB, 130 S. Ct. 2635 (2010) that two members of the NLRB may not exercise delegated authority when the total Board membership falls below three because "the delegation clause [in section 3(b) of the NLRA, 29 U.S.C. § 153(b)] requires that a delegee group maintain a membership of three in order to exercise the delegated authority of the Board." Id. at 2644. In light of the New

---

[2]The NLRB also affirmed the ALJ's finding that Whitesell had violated section 8(a)(5) by failing to provide information requested by the Union on August 10 concerning Whitesell's relocation of some bargaining unit employees to other facilities.

Process decision, this Court denied the NLRB's application for enforcement. NLRB v. Whitesell Corp., 385 F. App'x 613 (8th Cir. 2010) (unpublished per curiam). We subsequently denied the NLRB's motion for remand or clarification, and we also denied Whitesell's petition for a writ of mandamus to prevent the NLRB from reconsidering its decision in light of our denial of enforcement. With a three-member delegee group, the NLRB again considered the case and adopted the ALJ's conclusions for the reasons explained in the prior decision, which it incorporated by reference.

The NLRB now petitions this court for enforcement of its order. Whitesell opposes the petition, arguing: (1) the NLRB lacks jurisdiction to issue a new decision and order following this Court's denial of its previous application for enforcement; (2) substantial evidence does not support the NLRB's findings that Whitesell failed to bargain in good faith; (3) contrary to the NLRB's finding, Whitesell provided proper notice to the FMCS and therefore the NLRB improperly ordered Whitesell to reimburse the Union's dues; and (4) substantial evidence does not support the NLRB's finding that Whitesell improperly failed to provide further information concerning its vacation proposal.[3]

---

[3]Whitesell does not oppose the NLRB's order with respect to the NLRB's determination that: (1) Whitesell violated the NLRA by prohibiting Union members from posting notices about Union meetings on company bulletin boards during their break and unpaid time; (2) Whitesell failed to bargain in good faith by failing to provide information concerning Whitesell's administration of the merit-pay proposal at the company's other facilities; and (3) Whitesell failed to provide information concerning Whitesell's relocation of some bargaining unit employees to other facilities.

II.

As an initial question, we consider whether our prior opinion denying the NLRB's application for enforcement precludes the NLRB's from reconsidering this action. See 29 U.S.C. § 160(e). We hold that it does not.

Although many courts around the nation vacated the Board's decisions and remanded for further consideration in light of the New Process decision, we chose to deny the respective applications for enforcement in this case and in a companion case. See Whitesell Corp., 385 F. App'x at 614; NLRB v. Am. Directional Boring, Inc., 383 F. App'x 594, 595 (8th Cir. 2010) (unpublished per curiam). We were not alone in that action; both the First and Second Circuits also denied enforcement of applications without reference to remand. See NLRB v. Metro Mayaguez, Inc., 617 F.3d 13, 14 (1st Cir. 2010) (per curiam); NLRB v. Domsey Trading Corp., 383 F. App'x 46, 47 (2d Cir. 2010) (summary order); NLRB v. Talmadge Park, 608 F.3d 913 (2d Cir. 2010) (per curiam). Although the Talmadge Park court was amenable to an NLRB motion to clarify that the matter could be reconsidered by the Board, the Domsey Trading court declined the invitation to clarify its denial decision. The Domsey Trading court anticipated further proceedings before the NLRB and that a new petition for enforcement could be filed. Indeed, the case was reconsidered by the Board, and after the Board followed the same procedure as here by incorporating the prior decision, the Second Circuit addressed the merits of the Board's decision. See NLRB v. Domsey Trading Corp., Nos. 10-3356-ag, 08-5165-ag, 08-4845-ag, 2011 WL 563688 (2d Cir. Feb. 18, 2011).

In the prior action, the only question presented was whether to enforce the NLRB's order. Relying on the New Process decision, we denied the application for enforcement because the prior NLRB decision, reached while there were only two members of the Board, was invalid. On that issue, our decision is final. See 29 U.S.C. § 160(e).

-8-

We have yet to determine whether Whitesell violated the NLRA. Our prior denial does not preclude the Board, now properly constituted, from considering this matter anew and issuing its first valid decision. As the Second Circuit acknowledged in Domsey Trading, we expected that the Board would visit the merits of this case again. Had we expected otherwise, we would have likely granted Whitesell's petition for mandamus. The Board properly read our denial of the application for enforcement as based solely on the New Process decision. We now address the merits of the Board's decision for the first time.

III.

First, we address the issue of whether substantial evidence supports the NLRB's findings that Whitesell failed to negotiate to a valid impasse. Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). "Mandatory areas of collective bargaining include 'wages, hours, and other terms and conditions of employment.'" TruServ Corp. v. NLRB, 254 F.3d 1105, 1113 (D.C. Cir. 2001) (quoting 29 U.S.C. § 158(d)). The duty to bargain in good faith under section 8(a)(5) includes both the duty to bargain to impasse and the "affirmative obligation to furnish the recognized employee representative with information it needs." NLRB v. St. Clair Die Casting, L.L.C., 423 F.3d 843, 847 (8th Cir. 2005) (citing NLRB v. Acme Indus. Co., 385 U.S. 432, 435-36 (1967)).

We review the NLRB's factual findings under the deferential "substantial evidence" standard of review. See 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951). "We will enforce the NLRB's order as long as the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole." Cintas Corp. v. NLRB, 589 F.3d 905, 912 (8th Cir. 2009) (citing NLRB v. Rockline Indus., Inc., 412 F.3d 962, 966 (8th Cir. 2005)). "To meet the requirement of 'substantial evidence,' the Board must

produce more than a mere scintilla of evidence; it must present on the record such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, taking into consideration the record in its entirety including the body of evidence opposed to the Board's view." Pac. Micronesia Corp. v. NLRB, 219 F.3d 661, 665 (D.C. Cir. 2000) (citations and quotations omitted). Courts have long recognized that "in the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems." Dallas Gen. Drivers, Warehousemen & Helpers v. NLRB, 355 F.2d 842, 844-45 (D.C. Cir. 1966).

In NLRB v. Katz, 369 U.S. 736 (1962), the Supreme Court held that an employer violates sections 8(a)(1) and (a)(5) of the NLRA when the employer makes a unilateral change in a term or condition of employment without first bargaining to an impasse on that term. Id. at 743. An impasse occurs when "good faith negotiations have exhausted the prospects of concluding an agreement, leading both parties to believe that they are at the end of their rope." TruServ, 254 F.3d at 1114 (quotations and citation omitted). "Whether the parties have reached this point is a case-specific inquiry; there is no fixed definition of an impasse or deadlock which can be applied mechanically to all factual situations." Id. (quotation omitted). "Among the factors that the [NLRB] considers in evaluating the existence of an impasse are 'the bargaining history, the good faith of the parties in negotiation, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations." Id. (quoting Taft Broad. Co., 163 N.L.R.B. 475, 478 (1967)).

The NLRB's finding that Whitesell did not negotiate to a valid impasse is supported by substantial evidence. The NLRB based its decision, in particular, on the fact that "although [Whitesell] sought substantial changes from the parties' existing agreement, it imposed an arbitrary deadline on the negotiations by stating that it

intended to present its final offer by a specific date and engaged in only a limited number of bargaining sessions before declaring impasse[,] . . . [and Whitesell] declared impasse even though the parties exchanged proposals and reached agreements the day before and the day of the impasse declaration." Whitesell Corp., 352 N.L.R.B. 1196, 1197 (2008).

The record clearly supports the NLRB's findings. Whitesell's negotiator, Janowitz, informed the Union of Whitesell's intention not to negotiate beyond the expiration of the existing CBA when he sent the company's initial proposals to the Union, and he reiterated this intention at the first bargaining session. Whitesell acknowledges that it desired to implement substantial changes to the existing CBA and that it wanted "to negotiate a new agreement from start to finish." While there were eight bargaining sessions, the parties spent much of the time caucusing with their respective sides, and two of these sessions did not involve any substantive bargaining. Whitesell first presented its proposal to replace the Union's system of annual wage increases with a merit-based system at the third meeting. See Newcor Bay City Div. of Newcor, Inc., 345 N.L.R.B. 1229, 1239 (2005) (finding that a party failed to bargain in good faith when that party sought extensive changes to an existing agreement, but imposed "an artificial, relatively short, deadline for concluding a new agreement and then declared impasse when that deadline could not be met"); see also Ead Motors E. Air Devices, Inc., 346 N.L.R.B. 1060, 1063-64 (2006).

Moreover, despite Whitesell's claims of impasse, the parties came to agreement on 30 issues and were continuing to come to agreement on important issues up until the final meeting on June 12. For instance, on June 10, the Union compromised on some of its wage demands, decreasing its proposed wage increases for the second and third years of the contract and indicating its willingness to accept a modified version

of Whitesell's proposed merit-pay system.[4]  At the next-to-last bargaining session on June 11, Whitesell agreed to the Union's dues-checkoff proposal, and the Union accepted the company's proposals on holiday, vacation, and funeral leave.  The parties also came to an agreement on the safety equipment, strike and lockout, and bereavement pay provisions.  On the final day, the Union accepted Whitesell's group health insurance plan.

Whitesell claims that the parties were deadlocked on a number of important issues on the final day, in particular the standard for disciplinary action, retirement plan, wage increases, the company's insurance plan, vacation, seniority, overtime, and the leave of absence and sick leave provisions.  However, the disagreements over the standard for disciplinary action and overtime are the only issues over which the parties were clearly deadlocked.[5]  Concerning the retirement plan, Jeter testified that he did not understand the parties to be "at the end of their rope" because they had not yet fully discussed the differences between the Union's existing defined contribution pension and Whitesell's 401(k), or how the company's plan would affect the benefits accrued under the existing plan.  Nothing in the record contradicts Jeter's belief that the parties were not at an impasse over the retirement plan.  Whitesell's claim that the parties were deadlocked over wage increases is belied by the fact, already discussed above, that the Union reduced its proposed wage increases for the second and third year of the CBA and agreed to accept a modified version of the company's proposed merit-pay system two days before Whitesell declared impasse.[6]  Similarly, although

---

[4]The Union had initially requested $1 per hour wage increases for the second and third years of the CBA but reduced this to $0.50 per hour.

[5]Union representative Jeter stated at his deposition that the Union would never have accepted Whitesell's proposed "arbitrary action" standard for employee discipline and that he understood the parties to be deadlocked with regard to the overtime issue by the time Whitesell declared impasse.

[6]The fact that the parties were not deadlocked over the wage provision is also supported by the NLRB's finding, which Whitesell does not contest, that the

the parties had not reached an agreement on the time frame within which to introduce the increases in employee insurance premiums, at their final meeting the parties came to the more fundamental agreement that the Union would accept Whitesell's group health insurance proposal. Moreover, Whitesell compromised on its proposal to use performance evaluations in addition to seniority to determine layoffs and recall, a fact that undermines Whitesell's contention that the parties were deadlocked concerning seniority.[7]  Finally, Whitesell concedes that the provision concerning leaves of absence and sick leave was relatively unimportant to the parties, thereby diminishing the relevance of any disagreement over this provision to the question of whether the entire bargaining process had broken down. See TruServ, 254 F.3d at 1114 (noting that "the importance of the issue or issues to which there is disagreement" is a factor used in determining whether an impasse exists (quotation omitted)).

Further, the cases cited by Whitesell do not support its claims of impasse. In TruServ, the court reversed the NLRB's finding that the parties had not bargained to a valid impasse. 254 F.3d at 1115-17. However, unlike the company in TruServ, Whitesell has made no demonstration of economic exigencies that justified the haste with which it wanted to conclude the bargaining process. See 254 F.3d at 1115; see also Pub. Serv. Co. of Okla. v. NLRB, 318 F.3d 1173, 1181(10th Cir. 2003) (noting that demonstration of economic exigency justifies prompt implementation of a company's proposals); RBE Elecs. of S.D., Inc., 320 N.L.R.B. 80, 81-82 (1995) (discussing economic-exigency exception to duty to bargain to impasse). Moreover, the parties in TruServ had an extensive bargaining history with one another, whereas

company violated section 8(a)(5) by not providing information concerning the implementation of the merit-pay system at Whitesell's other facilities which Jeter requested on July 17, more than a month after Whitesell declared impasse. See Whitesell Corp., 352 N.L.R.B. at 1197, n.8.

[7]Whitesell made a counterproposal at the June 11 bargaining session offering to use performance-based criteria to determine layoffs and recall only as a tie-breaker between employees of comparable seniority.

the parties here were negotiating for the first time. See 254 F.3d at 1116 (noting importance of the parties' bargaining history). Similarly, in AMF Bowling Co. v. NLRB, 63 F.3d 1293 (4th Cir. 1995), the court held that the parties had reached a genuine impasse where the union had twice voted on and rejected the company's final offer without making any counteroffers that would indicate a willingness to compromise. Id. at 1300. There is no such indication of obstinacy on the part of the Union here.

Whitesell's claim that the parties were at a good-faith impasse is further undermined by the NLRB's finding that Whitesell failed to provide information about the vacation plan as required by section 8(a)(5) of the NLRA.[8] NLRB v. Acme Indus. Co., 385 U.S. 432, 435-36 (1967) (recognizing "the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties"). Although the Union ultimately accepted Whitesell's vacation proposal, the parties continued to disagree over whether, and to what extent, the company's plan would deprive employees of the vacation benefits they had earned under the expiring CBA. This disagreement was prolonged by Whitesell's failure to provide the information requested by the Union.

---

[8]Whitesell challenges this finding on the ground that it provided sufficient information to the Union. Whitesell's proposed vacation plan increased the years of service required for an employee to become entitled to additional vacation leave. Whitesell had provided the Union with a seniority list that stated each employee's date of hire. Based on this seniority list, Jeter estimated that one-third of its members would lose vacation time under the new plan. When Whitesell's negotiator responded that this estimate was incorrect at their second bargaining session on June 6, the Union requested the information on which Whitesell based its disagreement. The Union renewed this request on June 9. Whitesell never provided any additional information and insisted that the seniority list it had already submitted was sufficient. The fact that Whitesell disagreed with the Union's estimates provides substantial evidence for the NLRB's finding that Whitesell failed to bargain in good faith in violation of section 8(a)(5) by not accounting for the basis of its disagreement.

Finally, Whitesell also cancelled the voluntary supplemental accident fund without bargaining for the issue or including such a provision in its final offer. See United Paperworkers Int'l Union v. Champion Int'l Corp., 81 F.3d 798, 802 (8th Cir. 1996) ("[W]hen the parties have bargained to an impasse, the employer may unilaterally change terms and conditions of employ, so long as these changes are consistent with offers that the union has rejected."); Emhart Indus. v. NLRB, 907 F.2d 372, 376 (2d Cir. 1990) ("It is settled law that where an employer bargains in good faith to impasse, . . . it may implement unilateral changes in working conditions so long as the changes are reasonably comprehended within its pre-impasse proposals to the union.").

In conclusion, the record provides substantial evidence for the NLRB's determination that Whitesell failed to bargain in good faith in violation of sections 8(a)(1) and (a)(5) when it terminated the existing CBA and implemented its proposals without bargaining to a valid impasse.

IV.

Whitesell also contests the NLRB's finding that it failed to provide notice to the FMCS as required by section 8(d)(3) of the NLRA, 29 U.S.C. § 158(d)(3). This finding resulted in the requirement that Whitesell reimburse the Union for uncollected dues from July 13, 2006 (the day after the CBA expired) to September 30, 2006 (30 days after Whitesell provided the proper notice to the FMCS).

Relying on Petroleum Maintenance Co., 290 N.L.R.B. 462 (1988), the NLRB found that the failure to provide the requisite section 8(d)(3) notice constituted a separate violation of the duty to bargain under section 8(a)(5) and that the remedy for this violation was to extend the dues-checkoff provision until 30 days after the FMCS received the proper notice from Whitesell. See Whitesell Corp., 352 N.L.R.B. at 1198 (citing Petroleum Maint., 290 N.L.R.B. at 462-63 (holding that the failure to

provide notice to the FMCS as required by section 8(d)(3) violates sections 8(a)(1) and (a)(5) and that, in such circumstances, a dues-checkoff provision extends beyond the CBA until 30 days after the proper notice is ultimately delivered)).

Whitesell objects to this ruling on a number of grounds. First, Whitesell argues that, under NLRB precedent, it sufficiently demonstrated that it mailed timely notice to the FMCS. Second, Whitesell alternatively argues that the remedial period for reimbursing the Union should end 30 days after the Union contacted the FMCS requesting a federal mediator on July 10, claiming that, at this point, the FMCS was effectively put on notice of the dispute. Third, Whitesell argues "there is no sound reason" for Petroleum Maintenance's remedy of extending the dues-checkoff provision through 30 days after notice is received because, citing to a number of cases,[9] a violation of the notice requirement of section 8(d)(3) does not extend the terms of a CBA beyond the expiration.

We reject each of these arguments. As to the first and second arguments, the obligation is on "the party desiring such termination or modification" to "notif[y] the [FMCS] within thirty days after such notice of the existence of a dispute." 29 U.S.C. § 158(d)(3). Whitesell bears the burden of showing that the FMCS received the notice that a dispute had arisen between Whitesell and the Union. Merely stating that

---

[9]See New England Cleaning Servs., Inc. v. SEIU, Local 254, 199 F.3d 537 (1st Cir. 1999); Commc'ns Workers v. Sw. Bell Tel. Co., 713 F.2d 1118 (5th Cir. 1983); Proctor & Gamble Indep. Union v. Proctor & Gamble Mfg. Co., 312 F.2d 181 (2d. Cir. 1962); Lone Star Producing Co., 85 N.L.R.B. 1137, 1138 n.2 (1949). These cases are not quite on point for Whitesell, however, because they explicitly note that they are not dealing with claims that failing to provide notice in violation of section 8(d)(3) also constitutes an unfair labor practice in violation of sections 8(a)(1) and (a)(5). See, e.g., New England Cleaning, 199 F.3d at 540 ("While a failure to notify mediation services might have ramifications for an unfair labor practice claim, it does not serve to extend a contract that could be terminated via notice under section 8(d)(1).").

the notice was mailed does not show that notice was received by the FMCS. See Chauffeurs, Salesmen and Helpers, Local 572, 223 N.L.R.B. 1003, 1008 (1976) (holding that the notice provision of section 8(d)(3) requires "actual notice," or proof that the FMCS received the notice). Further, because Whitesell was the party seeking to modify the CBA, the obligation rested with Whitesell to perfect the notice. Thus, the Union's communication with the FMCS on July 10 to request a mediator does not meet the clear mandate of section 8(d)(3) that Whitesell serve as the notifying party.

Whitesell challenges the NLRB's reliance on Petroleum Maintenance in imposing the remedy for the violation of section 8(d)(3). As the NLRB found in Petroleum Maintenance, dues-checkoff provisions are not terms or conditions of employment that will continue to be in effect until the parties reach a new agreement or bargain to a genuine impasse. Therefore, Whitesell is only required to reimburse uncollected dues for the period ending 30 days after it gives the notice it is statutorily obligated to provide. See Petroleum Maint., 290 N.L.R.B. at 462-63 & n.4 (ruling that the termination of a dues-checkoff provision without providing proper notice to the FMCS constitutes a violation of the duty to bargain collectively under sections 8(a)(1) and (a)(5) that is remedied by reimbursing uncollected dues until 30 days after such notice is given). If the dues-checkoff provision was a term or condition of employment, Whitesell would be expected to comply with the provision until it reached a bargain or impasse, rather than for the finite period ending 30 days following proper notice. Whitesell, of course, could have avoided this obligation altogether had it insured that the proper notice was timely given to the FMCS.

V.

Finally, we address the claim that Whitesell failed to bargain in good faith by not providing information regarding changes in Whitesell's proposed vacation plan as requested by the Union during the negotiation of the new CBA in violation of 29 U.S.C. § 158(a)(1) and (a)(5). "There can be no question of the general obligation of

an employer to provide information that is needed by the bargaining representative for the proper performance of its duties." Acme Indus. Co., 385 U.S. at 435-36. "Similarly, the duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the term of an agreement." Id. at 436; see also WCCO Radio, Inc. v. NLRB, 844 F.2d 511, 514 (8th Cir. 1988) ("The duty extends to data requested in order properly to administer and police a collective bargaining agreement as well as to requests advanced to facilitate the negotiation of such contracts." (quotation omitted)). Where a party requests such information, the request should be evaluated under a "more liberal standard" of relevancy similar to that applicable to the discovery stage of litigation. Acme Indus. Co., 385 U.S. at 437 n.6.

We agree with the NLRB's findings that Whitesell violated sections 8(a)(1) and (a)(5) by not providing the requested information concerning how its vacation proposal would impact the employees. Prior to the negotiations, Whitesell provided the Union with a seniority list and indicated the Union would be able to determine, using the list, how the vacation proposal would impact the employees. When the Union stated it calculated that one-third of the employees would be adversely impacted by the vacation proposal, Whitesell responded that the Union's calculation was close but not accurate. This response resulted in the Union's request for a complete list of employees along with an explanation of how the vacation proposal would affect each employee.

Whitesell argues we should not enforce this part of the NLRB's findings because Whitesell provided the Union with a seniority list and the Union "was as fully capable as [Whitesell] of determining who would be affected immediately and in the future by [Whitesell]'s vacation proposal." This argument is belied by Whitesell's response that the Union's calculation was close but not accurate. The Union was entitled to the information upon which Whitesell was basing its individual vacation calculation. Accordingly, we find substantial evidence supports the NLRB's

finding that Whitesell violated sections 8(a)(1) and (a)(5) when it failed to provide the requested information.

VI.

Accordingly, we enforce the NLRB's order as supported by substantial evidence.

_____